

FILED

OCT 17 2016

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY CLERK

RECEIVED

OCT 17 2016

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

1: 16 CV   01562   SKO PC

Jesus Bonilla Castaneda
(Name of Plaintiff)
240 Alta Road
(Address of Plaintiff)
San Diego CA   92179

(Case Number)

vs.

CDCR et.al.

Continued a 1A

(Names of Defendants)

COMPLAINT
Jury Trial Demanded

I. Previous Lawsuits:

  A. Have you brought any other lawsuits while a prisoner:   ☑ Yes   ☐ No

  B. If your answer to A is yes, how many?: ___3___ Describe the lawsuit in the space below.  (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper using the same outline.)

  1. Parties to this previous lawsuit:

    Plaintiff   Jesus B. Castaneda

    Defendants   CDCR

(cont 2A)

FORM TO BE USED BY A PRISONER IN FILING A COMPLAINT
UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. § 1983          Rev'd 5/99

1

2. Court (if Federal Court, give name of District; if State Court, give name of County)

_Lassen Superior Court_

3. Docket Number ___unknown___

4. Name of judge to whom case was assigned ___unknown___

5. Disposition  (For example: Was the case dismissed? Was it appealed? Is it still pending?)
_Dismissed for failure to comply w/ tort claims Act._

6. Approximate date of filing lawsuit ___2006___

7. Approximate date of disposition ___2010___

II. Exhaustion of Administrative Remedies

   A. Is there a grievance procedure available at your institution?    ☒ Yes    ☐ No

   B. Have you filed a grievance concerning the facts relating to this complaint?
                                                                    ☒ Yes    ☐ No
       If your answer is no, explain why not _____

   C. Is the grievance process completed?    ☒ Yes    ☐ No

III. Defendants

   (In Item A below, place the full name of the defendant in the first blank, his/her official
   position in the second blank, and his/her place of employment in the third blank.  Use item B
   for the names, positions and places of employment of any additional defendants.)

   A. Defendant _James A. Yates_    Was employed as ___Warden___
      at _Pleasant Valley State Prison (PVSP)_

   B. Additional defendants _P.D. Pease, Sergeant(Sgt), PVSP;_
   _J.A. Mendez, Sgt, PVSP; J.G. Lopez, ISU Sgt, PVSP;_
   _Carlson, Sgt, PVSP; Larry Mackin, Captain, PVSP; D. May,_
   _Lieutenant, PVSP; Joseph Burnes, Corrections Officer (C.O.),_
   _PVSP; Thomas Thatcher, C.O., PVSP; Aguerelde, C.O.,_
   _PVSP; Sauceda, C.O., PVSP; McCamey, C.O., PVSP; Miller,_
   _C.O. PVSP; Daley, C.O., PVSP; McCullom, C.O., PVSP;_
   _(Continued)_

Additional Defendants continued

Black, C.O., PVSP; Ibal, C.O., PVSP; Contreras,
C.O., PVSP; D. Allen, Captain, PVSP; A. Guillen,
Correctional Counselor II (CCII); T. Walker, CCI,
PVSP; G Duran, CCI, PVSP; Scott Frauenheim, Warden
PVSP; Chen Ho, Doctor, PVSP; STU Sherman, Warden
Corcoran/Substance Abuse Treatment Facility (SATF);
Eric Smith, Associate Warden, SATF; C. Cryer, Chief
Executive Officer, SATF; Williams, Correctional Counselor
II, SATF; Acevedo, CCII, Kern Valley, State Prison (KVSP);
Viper, Warden, KVSP; Sgt John Doe, Sergeant, KVSP;
Chavez, Medical Escorting Officer, KVSP; Hacker Associate
Warden, (SATF)


Previous lawsuits continued
 - Jesus B. Castaneda V. S. Daley   USDC- Eastern District
   1:15-cv-01863-DAD SAB  pending removal to State

 - Jesus B. Castaneda v. D. Foston et al USDC. Eastern District
                              pending centioary

 - Jesus B.

IV.     Statement of Claim

(State here as briefly as possible the facts of your case. Describe how each defendant is involved, including dates and places. Do not give any legal arguments or cite any cases or statutes. Attach extra sheets if necessary.)

On 2/7/10, plaintiff, Jesus B. Castaneda was being housed at PVSP on C yard, building two, cell 149. Defendant Josephs Burnes was the sole floor officer and C.O. Black was the sole tower officer. The entire institution was on First watch due to staff shortages; a large amount of officers took that Sunday off to attend or hold Super Bowl parties. (On First watch, all inmate movement is suspended, 10p.m - 6.A.M, On First watch status, all inmate movement and normal programming is suspended due to
(con-t)
3A

V. Relief.

(State briefly exactly what you want the court to do for you. Make no legal arguments. Cite no cases or statutes.)

Issue a Restraining Order stopping Defendants and their agents from intentionally failing to protect plaintiff. Allow a Jury to award plaintiff compensatory and punitive damages for the acts described herein.

Signed this ____19____ day of ____September____, 20 _16_ .


_____
(Signature of Plaintiff)

I declare under penalty of perjury that the foregoing is true and correct.


_____            _____
(Date)                                      (Signature of Plaintiff)

3

Statement of Claim, continued:

inclement weather, institutional emergency's, and staff shortages.)

Shortly after dinner was distributed to all inmates in the building, C.O.'s Burnes and Black, began to watch the Super Bowl game on the day room televisions. As the team that C.O. Burnes ~~continued to~~ was cheering for, continued to err, He grew more and more agitated and upset. Burnes began to yell at inmates (who were locked in their cells) to shut up and stop cheering for the opposing team. C.O. Burnes threatened multiple inmates who continued to cheer, and kicked multiple doors of those who were cheering.

At approximately 6:30 p.m., Burnes' team made an error that ensured that they would lose the game. At this point C.O. Burnes removed his O.C. (Oleoresin Capsicum) spray and began to shake it in preparation for use. C.O. Burnes then instructed C.O. Black to unlock cell 142 as soon as He (Burnes) reached the cell door.

As soon as C.O. Burnes stepped in front of cell 142, C.O. Black (in the tower) unlocked the door by engaging the button that unlocks that door. As soon as the door was unlocked, it automatically opened a couple of inches. Without warning or provocation, C.O. Burnes began to discharge O.C. spray to the face of plaintiff who was sitting in his wheelchair just inside the door.

Plaintiff tried to shield his eyes and face by doubling over. C.O. Burnes then swung the door

Statement of claim continued
os A, 3A, 3B, 3C, ... 3Q

until it was locked all the way open. Still not having issued any warning nor instructions. C.O. Burnes then continued to spray plaintiff in the head and upper body while trying to pull plaintiff out of the cell by pulling on the back of plaintiffs wheelchair with his other hand.

Not being able to maneuver the wheelchair through the doorway, Burnes dumped plaintiff onto the floor and continued to discharge O.C. spray onto plaintiffs' face and upper body. Plaintiff tried to drag himself away from the doorway and towards the toilette in order to shield himself from the O.C. spray being discharged by C.O. Burnes. C.O. Burnes entered the cell in order to continue spraying plaintiff. Only after plaintiff was in a semi-fetal position, did C.O. Burnes direct his attention to plaintiffs cellmate. C.O. Burnes began to spray plaintiffs cellmate (John Madrid) in the face and upper body. C.O. Burnes then stepped into the cell to grab inmate Madrid by his clothing and drag him out of the cell. C.O. Burnes continued to spray Madrid with one hand while dragging Madrid out of the cell by pulling Madrids clothing. C.O. Burnes then threw Madrid onto the ground, holstered his now empty O.C. canister, and began to punch Madrid in the face and upper body.

It took plaintiff over ten minutes to be able to decontaminate enough to function. (It should be noted, that neither C.O. Burnes nor C.O. Black have activated a personal alarm) Plaintiff, who is a wheelchair bound paraplegic (T-6, complete)

Statement of Claim

3A

dragged himself to the open doorway. Plaintiffs wheelchair was over forty feet away. C.O. Burnes was in the dayroom holding Madrid with His left hand while repeatedly punching Madrid in the face and upper body. Madrid was on His back unsuccessfully trying to block the strikes from C.O. Burnes. Madrid eventually lost consciousness as Burnes continued to strike Madrid in his unprotected face.

Plaintiff then began to drag himself to where Burnes was killing Madrid. It took plaintiff several minutes to drag himself only a few yards. When plaintiff was within a few yards from Burnes and Madrid, C.O. Black (who was hiding in the tower bathroom) finally activated His personal alarm.

The first officer to respond to the alarm was Thatcher. Without issuing any warning or instructions, C.O. Thatcher began to strike plaintiff with his Monadnock Expandable Baton (MEB). As Defendants Pease, Mendez, Agueralde, Sauceda, McLamey, Miller, Daley, McCullom, Carlson, May, Contreras, Ibal, and John Does 1-5, arrived, they joined Burnes and Thatcher in beating, kicking, punching, and spraying plaintiff and John Madrid.

After plaintiff was placed in restraints and was being dragged out of the building, late responding officers took turns kicking and punching plaintiff in the head and body. As a result of the actions

of these officers, plaintiff suffered multiple concussions, broken ribs, nerve damage at wrists as well as emotional and psychological injuries.

As a result of his injuries, John Madrid would need to be airlifted to Fresno Regional Medical Center (FRMC) and be placed on full life support.

Because all of the aforementioned Defendants believed that John Madrid would not survive his injuries, they then conspired to cover-up their crime by fabricating a story that John Madrid had attempted to murder C.O. Burnes.

The following day, 2/8/10, L. Mackin, (under the direction of Warden Yates) would attempt to relay a false version of the events that plaintiff was expected to adopt. When plaintiff corrected Mackins false version, L. Mackin told plaintiff that life was going to become a living hell unless plaintiff did what he was told. Plaintiff was afraid of what was possible but still refused to assist in covering up the crimes committed by Defendants.

This interview process was repeated later on that same day when Defendant J.G. Lopez once again tried to threaten plaintiff into assisting to cover-up the crimes of officers. Plaintiff again refused to do so.

Immediately following the incident, a report had to be filed that described the basic elements of the incident. This report was filed by C.O. Burnes and only described an incident between himself and John Madrid. It did not include plaintiff or any

3 c
4/19

"unidentified" individuals. This allowed the Defendants the ability to completely rewrite any additional reports.

On or about 2/21/10, John Madrid, for the first time, showed signs that He would recover from His injuries. (John Madrid was on 24 hour observation at FRMC.) If John Madrid died or did not recover from His comatosed state, a large investigation would ensue that would include outside agencies. Burnes would have to accept responsibility for His actions. When John Madrid began to recover, the possibility of an outside investigation, vanished. At this point, Defendant and Warden, James A. Yates ordered all of the aforementioned Defendants to falsify reports that John Madrid attempted to Murder C.O. Burnes and that plaintiff assisted Madrid in the act.

On or about 2/24/10, plaintiff was issued a Rules Violation Report which included false statements by Defendants Pease, Mendez, Burnes, Thatcher, Aguenaldes, Sauceda, McLamey, Miller, Doley, McCollom, Carlson, May, Lopez, Mackin, Black, Ibal, and Contreras.

During the 17 days that plaintiff was in Administrative Segregation (Ad Seg) plaintiff was repeatedly threatened, physically, and Phycologically, abused, and denied food and medical attention. The threats issued by Lopez and Mackin rang true. Upon being issued a copy of the false reports, plaintiff decided to take His own life rather then allow the torture to continue.

On the very next occasion that plaintiff was escorted to the shower and issue a shaving razor, plaintiff would cut two life threatening

3D

5/19

wounds to both femoral arteries. Plaintiff would need to be airlifted to FRMC for immediate treatment. It should be noted that neither John Madrid, nor plaintiffs emergency contact information was used to notify families of the situation. As a result, no one outside of the institution would become aware of the situation for months. Plaintiffs mother, Bertha Castaneda would actually come to the institution to investigate why none of Her letters to plaintiff were being responded to. She would not be allowed to visit plaintiff but not told why or about any of the afore-mentioned events.

When family members did find out about what had occurred, plaintiffs sister, Mabel Escobedo would try to file a Citizens Complaint on His Behalf. Defendant Mackin would inform Mabel that there was no way for citizens to file any complaint.

John Madrid would spend five months in an outside hospital before being returned to PVSP. Plaintiff would be committed to the Department of Mental Health. (DMH). Plaintiff and John Madrid would be Kept in Ad-Seg for three years before being released.

Plaintiff would be released back to the same yard where the incident occured and immediately begin collecting declarations and affidavits as well as names and CDC numbers of inmates willing to testify about the events that occured on 2/7/10.

On 9/24/13, plaintiff would go to committee where all of the committee members would agree to retain plaintiff at PVSP. Shortly after, one of

3 E

plaintiffs friends would ask to be removed off of the yard for safety concerns. This inmate would be told that he would not be protected unless he could provide staff with information that would be usefull. This inmate would inform staff that plaintiff was collecting many witnesses for an upcoming trial. ( The Fresno County District Attorney's office would accept to prosecute plaintiff for Attempted Murder of a Peace Officer) on June 24, 2011)

Upon learning about plaintiff collecting witnesses, Defendants Yates, Allen, Guillen, Walker, Duran and Fraunheim would conspire to punish plaintiff for his actions and simultaneously deprive plaintiff of the declarations/affidavits. They would order Doctor Chen Ho to falsely identify plaintiff at High Risk for Valley Fever solely for having been diagnosed with osteoporosis.

Doctor Chen Ho would openly tell plaintiff that He had been ordered by custody to change the medical Risk designation so that plaintiff could be transfered. Exactly 30 days after being endorsed by committee to remain at PVSP level III yard, plaintiff would be returned to committee and endorsed for transfer to Corcoran / Substance abuse treatment Facility (SATF) Level IV, inspite of having level III points.

Plaintiff would be transfered to Corcoran days later. It should be noted that John Madrid was also transfered to Corcoran.

Unbeknownst to plaintiff, prior to being transfered to Corcoran, Defendants Burnes, Mackin, and Sauceda would be reassigned to Corcoran from PVSP.

After the transfer, when plaintiffs property was returned, all of the declarations/affidavits would be missing, along with the lists of witnesses and their CDC numbers. Upon transfer to Corcoran, John Madrid was relieved of all of his legal materials. Included in John Madrids legal materials was a letter from plaintiff informing John Madrid that plaintiff would remain to try to hold Defendants responsible for what had occured. Plaintiff informed John Madrid (in this letter) that if plaintiff was unable to hold Defendants to answer for they had done, a successful suicide would follow. Defendants would exploit the information in this letter to try to compel plaintiff to take his own life through a campaign of harrassment during the 3 year stay at Corcoran.

Prior to transfer, plaintiff expressed safety concerns to Defendants Allen, Guillen, Walker, Duran, and Frauenheim. Plaintiff informed these Defendants about certain case factors which would make plaintiff certain to be assaulted or killed at Corcoran. Defendant Allen told plaintiff that he was not being transfered in spite of safety concerns, but because of them.

Prior to being released onto the yard at Corcoran, plaintiff expressed safety concerns to multiple individuals. These concerns were ignored.

Plaintiff was initially kept in a cell by

3 b

8/19

himself for several months to allow an assault to take place on the yard or in the dayroom. When an assault did not take place, Defendants then began to assign inmates to share a cell with plaintiff only if they had a history of assaultive behavior. When plaintiff would ask for that inmate to be removed from his cell, they would replace him with another inmate who also had a history of assaultive behavior.

During the three year stay at Corcoran, plaintiff would be assaulted (physically, sexually, and psychologically) by multiple cell partners.

On or about 1/6/15 a C.O. would intentionally damage plaintiffs personal wheelchair. Plaintiff would file administrative appeal to have the wheelchair repaired. Defendants STU Sherman and Eric Smith would delay issuing a response until 3/3/15. This delay was used to allow Defendants Sherman, Smith, and others, to implement new policies that were designed solely to prohibit plaintiff from being able to have his wheelchair repaired. These policies were signed into effect on 2/31/15.

Plaintiff was disabled and required a wheelchair specially designed to allow the most mobility with the least resistance. Defendants Smith and Sherman had a wheelchair issued to plaintiff that caused multiple injuries including many falls, shoulder elbow, wrist, and back pain. These Defendants also falsified reports that indicate that plaintiff wheelchair could not be fixed.

3H

8/19

Plaintiff sought assistance from the Prison Law Office, an agency who was assigned to monitor compliance with the Americans Disabilities Act (ADA) within CDC. On o- about 5/25/15, plaintiff contacted the prison Law office and sent them copies of the Appeal responses issued by the prison. Plaintiff also included receipts of purchase of the very items that the prison staff said that they could no longer purchase (The prison staff falsely told plaintiff that his personal wheel chair could not be fixed because the damaged parts were no longer available for purchase.) Plaintiff had purchased those very same items and had them delivered to the prison just months prior.

Plaintiff sent copies of all the materials to the Defendants Sherman, and Smith. Plaintiff received a response from the prison Law office a few weeks later.

The Prison Law Office has a standard procedure of photocopying all documents submitted by inmates, and returning the originals to the inmate, along with a response.

When plaintiff received a response from the Prison Law office, Plaintiff noted that all of the receipts had been removed and replaced with documents from plaintiffs medical file which would falsely lead one to believe that plaintiff did not require a wheel chair at all.

As soon as Defendants Sherman and Smith received their copies, they had plaintiffs legal mail (to the Prison Law Office) opened, the documents removed, and others inserted in its place. As a result, plaintiff received no assistance from the Prison Law office.

3I

10/19

Plaintiff had been going to court on a regular basis to face charges for attempted murder of a Peace officer. During the preliminary hearing Defendants Burnes, McCullough and Thatcher gave false testimony on the stand (after being sworn in) that plaintiff and John Madrid tried to murder C.O. Burnes.

On multiple occassions, the prisons count Liaison asked the D.A. to offer plaintiff a plea deal for misdemeanor resisting arrest. Plaintiff refused.

On 1/15/15, the Superior Court Judge advised all parties that Jury selection would begin at the next scheduled court hearing. At this point, the prisons' court liaison asked the D.A. to dismiss all charges against both plaintiff and John Madrid. The D.A. dismissed all charges.

Defendants had acquired the letter written to John Madrid by plaintiff where plaintiff explained that if the officers are not held accountable, a successful suicide would follow. All of the Defendants believed that the dismissal of the criminal charges would relieve plaintiff of a Jury trial and the opportunity to hold the officers responsible.

Upon being returned to prison, following the dismissal of charges, plaintiff was dropped off at Receiving and Release at Corcoran. Plaintiff was not put into the ADA holding cell, but the cell that was farthest out of view of any officers. The only other holding cell that was occupied was the ADA cell, which was occupied by

3 J

an abled-bodied inmate. The ADA cell is located where it is in plain view of all R+R officers, for obvious reasons.

The holding cell that plaintiff was placed in contained nothing but a brand new shaving razor. Plaintiff took the razor and hid it in his wheel chair. Plaintiff was kept in that holding cell for over two hours, unsupervised. When the escorting officers arrived to escort plaintiff to his yard, plaintiff was loaded onto a golf kart and returned to his yard.

Upon leaving R+R, the escorting officers were radioed to contact R+R through a land line prior to delivering plaintiff to his housing unit. The escorting officers turned around and drove back to R+R. The R+R officers explained that they had been instructed to ensure that plaintiff was placed into the holding cell with the shaving razor and for plaintiff to remain unsupervised. They expected that plaintiff would have self-inflicted life threatening wound. They were unsure of what to do now that plaintiff just took the razor.

Prior to being delivered to his housing unit, the escorting officers searched plaintiffs wheel chair and relieved him of the razor.

On or about 8/21/15 plaintiff was scheduled for an Institutional Classification Committee (ICC) Days prior to the ICC, plaintiff was interviewed by Defendant Williams. During

3

12/19

this interview, plaintiff informed CCII Williams that Correctional Staff had been intentionally been placing inmates into his cell to assault him. Defendant Williams tried very aggressively to discourage plaintiff from filing any report. When plaintiff insisted, Williams said that it would be discussed at the ICC in front of committee.

On 8/21/15 plaintiff was escorted into ICC by C.O. Hopkins. ICC consisted of Williams and Defendants Collins and Hacker. Defendant Williams then read a prepared statement that essentially plaintiff should remain here with no changes. Defendant Williams made no mention of the discussion with plaintiff. When ICC was over and plaintiff was being dismissed, plaintiff asked Williams about the previous discussion that was supposed to be discussed at ICC. Williams feigned ignorance of any discussion. When it became clear that Williams was intentionally avoiding the subject, plaintiff then addressed the whole committee. Plaintiff informed the committee that multiple staff members had intentionally placed individuals in plaintiffs cell in order to assault plaintiff. Plaintiff informed ICC that if it continued to occur, it would only do so under ICC authorization.

As soon as plaintiff was done addressing the committee, Defendant Collins informed plaintiff that if plaintiff submitted any report regarding these matters, that Collins would ensure that

plaintiff was assaulted by other inmates. Plaintiff immediately ceased any further discussion and asked to be returned to his housing unit.

The following week plaintiff was approached by C.O. Hopkins (the ICC escorting officer) and encouraged to report the assaults, Plaintiff would do so and be placed into Ad-Seg. The following day, plaintiff would be delivered medical supplies out of his property with a brand new shaving razor hidden inside.

Upon placement in Ad-Seg, plaintiff was immediately ostracized by other inmates, True to His word, C.O. Collins ensured that everyone on the yard and in Ad-Seg were aware that plaintiff had reported in-cell assaults, The last cellmate that had assaulted plaintiff was housed three doors away from plaintiff in Ad-Seg.

The Ad-Seg committee deemed the safety concerns localized to Corcoran and endorsed plaintiff for transfer to High Desert State Prison (HDSP). The only problem with this endorsement was that all of the other inmates in Ad-Seg (who were aware that plaintiff had reported in-cell assaults) were also endorsed for transfer to HDSP.

Plaintiff filed multiple emergency appeals that were delayed. In response, plaintiff wrote letters to Defendants Sherman, Brightwell, Smith, and Peterson. (all of the committee members in Ad-Seg) Defendant N. Peterson came to speak with plaintiff after-having

3M

14/19

received plaintiffs letter. Plaintiff explained to peterson that the safety concerns would not be localized if he was transferred to the same place as other inmates who were aware of the circumstances. Peterson said that all of the committee members were aware that plaintiff would be injured or killed upon transfer. When plaintiff asked Peterson, how they could allow that, Peterson told plaintiff that it was all plaintiffs' fault; that he had been warned by Collins to not report the in-cell assaults. That there was a price to pay.

On 12/11/15 plaintiff was transferred to HDSP. During committee plaintiff informed the committee of the aforementioned safety concerns. The committee verified the presence of inmates from plaintiffs previous prison and immediately put plaintiff up for transfer to Kern Valley State Prison (KVSP). Plaintiff was transferred to KVSP on 1/6/16

On 1/11/16, plaintiff spoke to Defendant CCII Acevedo in preparation for an upcoming parole hearing. Plaintiff informed Acevedo of the aforementioned events. Acevedo informed plaintiff that he would likely be killed under those circumstances on A-yard, where plaintiff was going to be released. Acevedo informed plaintiff that A-yard contained many verified Mexican Mafia members.

On January 12, 2016 plaintiff was inter-

3N

viewed (telephonically) by Defendant Peterson regarding an appeal submitted prior to transfer.

On January 14, 2016, plaintiff was placed before a committee headed by Defendant Acevedo. Plaintiff asked not to be released onto A-yard but to be placed into protective custody. Acevedo, who was a good friend of Defendant CCII Williams, had spoken to Williams and had been advised to not allow plaintiff to escape his punishment. Acevedo placed plaintiff into Ad-Seg with the recommendation that plaintiff be returned to A-yard.

In Ad-Seg, on January 2d^th, 2016 plaintiff went before a committee headed by Defendant Viper. Plaintiff explained to the committee how staff members had taken steps to ensure that plaintiff was hunt by other inmates. Warden Viper began to review plaintiffs file. As soon as the Warden came across the reference to the Attempted Murder of a Peace Officer, he asked the Defendant Sgt John Doe #1, what he recommended. Sgt John Doe #1 said, "Send him back to A-yard"

When plaintiff was returned back to his cell in Ad-Seg, he vowed not to allow himself to be returned to A-yard. Defendants Viper, Sgt John Doe had anticipated this, and had C.O. Chavez go' to plaintiffs cell and inform plaintiff that the Doctor wanted to see him. As soon as plaintiff was placed in restraints, Defendant Chavez escorted plaintiff back to A-yard.

A single cell designation, put in place

30

by HDSP, was removed, and plaintiff was placed into a cell with another inmate who would later be identified by custody as a Mexican Mafia member.

Plaintiff was quickly identified by other inmates as having placed himself into protective custody the week before from another building. Inmates had arranged for a cell move to have another inmate punish plaintiff. (They didn't want the Mexican Mafia member to do it) A cell move could not take place until plaintiff went back to committee and was released from orientation status.

On January 28th, 2016 plaintiff was called to medical. While at the medical clinic, plaintiff explained the circumstances to an R.N. Plaintiff also informed the R.N. that he was experiencing suicidal ideations because of the intentional acts of correctional staff. Medical staff immediately removed plaintiff from the yard and placed him on observation at the Correctional Treatment Center (CTC)

At CTC plaintiff was begun on anti-depressants and admitted to the mental health delivery program. The CTC committee took further steps to ensure that plaintiff could not be returned to A-yard. Plaintiff was placed into the Enhanced Outpatient Program (EOP) and begun on a transition to a Sensitive Needs Yard (SNY). In spite of this, CCII Accevedo came to see plaintiff at CTC on or about February 3, 2016 and vowed to return plaintiff to A-yard. Plaintiff was then placed into EOP Ad-Seg pending SNY designation.

3P

17/19

While in EOP Ad-Seg, plaintiff was allowed access to a legal computer for the first time. Upon finishing and asking to be returned to his cell, plaintiff was placed into restraints and escorted out of the building and back to A-yard. The escorting officers said that they were ordered to return plaintiff back to A-yard for having filed an appeal against staff for being placed on A-yard on 1/21/16.

Also as punishment for not allowing himself to be hurt, CCII Acevedo and Viper ordered 2½ boxes of plaintiffs property to be disposed of. All of plaintiffs toothpaste, soap, deodorant, clothes, and food was confiscated. The only toiletry item that plaintiff was allowed to retain, was a half bottle of lotion, so that, as Acevedo put it, plaintiff could use it the next time he was sexually assaulted.

While being led back to A-yard by the escorting officers, plaintiff pleaded for his life. The escorting officers placed plaintiff into a holding cell until plaintiff could be returned back to EOP Ad-Seg.

After receiving assistance from Mental Health staff, plaintiff was transfered out of KVSP to Richard J. Donavan prison on 4/21/16. Plaintiff was kept in Ad-Seg until transfer.

While the retaliation and attempts to have plaintiff hurt or killed continue here at RJD, none of those Administrative Remedies have yet been exhausted. As soon as they are, plaintiff will ask to be allowed to file a supplemental complaint.

It should be noted, that many of the retaliatory acts that took place within the last 18 months were because plaintiff filed a state tort against multiple Defendants on February 2015. Defendants removed the case to Federal Court on 12/11/15. On 3/7/16 plaintiff asked for the case to be remanded back to state court but to allow plaintiff to file a complaint in Federal Court and allow plaintiff to include the retaliatory acts described herein. On September 6, 2016 Judge Dale A. Drozd ordered the initial case remand back to state court (1:15-CV-01863-DAD-SAB) and ordered.

> Plaintiff is advised that he must file a complaint in a separate and new action in this court if he wishes to pursue a new and different claim, including any retaliation claim, not raised in his original complaint filed in this action
> (Doc #24 pg. 2, footnote)

3/10/16