1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11   JESUS BONILLA CASTANEDA,            Case No.: 1:16-cv-01562-JLT-SKO (PC)

12                    Plaintiff,          **FINDINGS AND RECOMMENDATIONS
                                          REGARDING DEFENDANTS' MOTION
13          v.                            FOR SUMMARY JUDGMENT**

14   SHERMAN, et al.,                     (Doc. 75)

15                    Defendants.         **14-DAY OBJECTION PERIOD**

16

17

18          Defendants Acebedo, Collins, Pfeiffer, Peterson and Williams move for summary

19   judgment addressing the merits of Plaintiff's operative complaint. (Doc. 75.) For the reasons set

20   forth below, the Court recommends that Defendants' motion for summary judgment be denied.[1]

21   **I.    RELEVANT PROCEDURAL BACKGROUND**

22          Plaintiff filed his first amended complaint on July 10, 2017. (Doc. 13.) Following issuance

23   of the Third Screening Order on March 26, 2018, (Doc. 16), the Court ordered service appropriate

24   on claim two of the first amended complaint—deliberate indifference to a serious risk of harm

25   _____

26   [1] In arriving at these findings and recommendations, the court carefully reviewed and considered all
     arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses
27   thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument,
     document, paper, or objection is not to be construed to the effect that this court did not consider the
28   argument, document, paper, or objection. This court thoroughly reviewed and considered the evidence it
     deemed admissible, material, and appropriate.

1   under the Eighth Amendment—and dismissed claims one and three. (Doc. 20.)

2         Following service of process, Defendants filed a motion to dismiss on June 21, 2018.

3   (Doc. 36.) Plaintiff filed and opposition and Defendants filed their reply brief. (Docs. 39, 41.) On

4   February 20, 2019, the undersigned issued Findings and Recommendations, recommending

5   Defendants' motion be denied. (Doc. 43.) Chief District Judge Lawrence J. O'Neill adopted the

6   findings and recommendations in full on March 20, 2019. (Doc. 46.)

7         Defendants filed an answer to Plaintiff's operative complaint on March 27, 2019. (Doc.

8   47.)  Following unsuccessful settlement efforts, a Discovery and Scheduling Order issued on June

9   7, 2019. (Doc. 55.)

10         On August 29, 2019, Defendants filed a motion for summary judgment alleging Plaintiff

11   failed to exhaust his administrative remedies prior to filing suit. (Doc. 56.) Plaintiff filed an

12   opposition and Defendants filed their reply briefs. (Docs. 60, 62.) On January 14, 2020, the

13   undersigned issued Findings and Recommendations, recommending Defendants' motion be

14   granted in part and denied in part. The motion was granted as to Defendants Hacker and Sherman

15   and denied as to the remaining Defendants. (Doc. 65.) District Judge Dale A. Drozd adopted the

16   findings on March 18, 2020, and dismissed Defendants Hacker and Sherman from this action.

17   (Doc. 68.)

18         On July 17, 2020, Defendants filed the instant motion for summary judgment addressing

19   the merits of Plaintiff's first amended complaint. (Doc. 75.) Plaintiff filed an opposition to

20   Defendants' motion (Doc. 81), and Defendants filed a reply (Doc. 89).

21   **II.   EVIDENTIARY MATTERS**

22         In their motion for summary judgment, Defendants provided Plaintiff with the

23   requirements for opposing the motion under Federal Rule of Civil Procedure 56. (Doc. 75-1.)

24   Plaintiff nonetheless failed to accurately[2] reproduce some of the itemized facts in Defendants'

25   statement of undisputed facts and failed to expressly admit or deny any of those facts, pursuant to

26   Local Rule 260. (*See id.* at 2-3.) Where Plaintiff fails to identify or address a disputed fact

27   proffered by Defendant, that fact will be considered admitted. Plaintiff included his own

28   _____
[2] In some instances, Plaintiff changed or reframed Defendants' facts.

1   "statement of undisputed facts," of which approximately one-half are not supported by citation to

2   evidence. (*See* Doc. 81 at 26-33.)

3       In support of his opposition to Defendants' motion for summary judgment, Plaintiff also

4   submitted his own declaration and two declarations from inmates currently incarcerated at the

5   R.J. Donovan Correctional Facility. (Doc. 81 at 34-36 [Plaintiff], 50-51 [Bonty], 53-56

6   [Ramirez].) The Court will consider the declarations as evidence, except those portions not based

7   on the declarants' own personal knowledge or perception. *See* Fed. R. Evid. 602, 701.  Because

8   Plaintiff is *pro se* and attests under penalty of perjury that the contents of his complaint are true

9   and correct (Doc. 13 at 19), the Court also considers as evidence parts of the complaint that are

10   based on Plaintiff's personal knowledge. *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004)

11   (citations omitted).

12   **III.**    **SUMMARY OF FACTS**

13       **1.**  **Plaintiff's Factual Allegations**

14       Plaintiff's claims stem from events that occurred while he was incarcerated at Substance

15   Abuse Treatment Facility and State Prison, Corcoran (SATF), High Desert State Prison (HDSP),

16   and Kern Valley State Prison (KVSP). (Doc. 81 at 27, ¶¶ 2-4.) Plaintiff alleges that, while at

17   SATF, prison staff intentionally placed assaultive inmates in his cell. (Doc. 13 at 7.) Plaintiff

18   states that he attempted to report staff's conduct to the unit classification committee (UCC),

19   including Associate Warden Collins, Correctional Captain Hacker, and Correctional Counselor

20   Williams, but the UCC made no changes to Plaintiff's housing assignment at that time. (*Id.*)

21   Plaintiff alleges that, once he finished addressing the UCC, Defendant Collins told Plaintiff that if

22   he reported the assaults, Collins would ensure that Plaintiff was hurt or killed by other inmates.

23   (*Id.* at 8.)  Plaintiff nevertheless reported the assaults, (Doc. 13 at 8), and was placed in

24   administrative segregation (Ad Seg) and approved for transfer to HDSP. (*Id.*) Other inmates in

25   Ad Seg were also approved for transfer to HDSP; thus, if Plaintiff were transferred with them, his

26   safety concerns would no longer be "localized." (*Id.*) Plaintiff alleges that he informed

27   Correctional Counselor Peterson of his concerns, who responded that Plaintiff "had been warned

28   to not report the in-cell assaults by defendant Collins, that there was a price to pay." (*Id.* at 9.)

Plaintiff was transferred to HDSP on December 11, 2015. (Doc. 13 at 9.) He informed HDSP's UCC of his safety concerns, and was approved for transfer to KVSP. (*Id.*) Plaintiff was transferred on January 6, 2016. (*Id.*)

At KVSP, Plaintiff informed Correctional Officer Acebedo of the events at SATF and HDSP. (Doc. 13 at 9.) Plaintiff appeared before KVSP's UCC on January 14, 2016, which included Defendant Acebedo and Correctional Officer Jones (not a defendant). (*Id.* at 10.) Plaintiff alleges that Acebedo told Plaintiff that he spoke with Defendant Williams at SATF and "had been advised to not allow plaintiff to escape his punishment," and that he planned to return Plaintiff to "A-yard." (*Id.*) On January 21, 2016, Plaintiff again appeared before the UCC, this time headed by Warden Pfeiffer, and requested not to be returned to A-yard. (*Id.*) Plaintiff alleges that once Defendant Pfeiffer "came across the reference to 'Attempted Murder of a C.O.' [Pfeiffer] said 'send him back to A-yard.'" (*Id.*) Plaintiff states that he was placed in a cell with an inmate who was a "verified Mexican Mafia member," and was "kept prisoner in his cell by his cellmate." (*Id.* at 11.)

Plaintiff visited medical staff on January 25, 2016 and expressed suicidal "ideation as a result of custody actions." (Doc. 13 at 11.)  Medical staff sent Plaintiff to the Correctional Treatment Center (CTC) and placed him under psychiatric care. According to Plaintiff, on or about February 10, 2016, Defendant Acebedo visited Plaintiff at CTC and stated that he would "ensure that plaintiff was returned to A-yard." (*Id.*)

Plaintiff alleges that, on February 24, 2016, Acebedo instructed staff to return him to A-yard. (Doc. 13 at 12.) After the escorting officers left, Plaintiff informed A-yard staff of his safety concerns and was then placed in a "holding cell at medical until arrangements could be made to return … [him] to Ad-Seg." (*Id.*)

**2.  Defendants' Statement of Undisputed Facts**

As noted above, Plaintiff did not expressly admit or deny Defendants' particular facts. Following a review of Plaintiff's opposition (*see* Doc. 81 at 26-33), the Court interprets Plaintiff's lack of citation to contrary evidence as an admission and Plaintiff's citations to contrary evidence as a denial, as noted in brackets below.

4

1.    During the events at issue in this case, Plaintiff Jesus Castaneda (K-23993) was an inmate in the custody of the California Department of Corrections and Rehabilitation (CDCR). (Doc. 13 at 1 [**admitted**].)

2.    Plaintiff was housed at California Substance Abuse Treatment Facility (SATF) from November 30, 2013, to December 11, 2015. (Dec. of B. Feinberg (Feinberg Dec.) ¶ 8 [**admitted**])

3.    Plaintiff transferred from SATF to High Desert State Prison (HDSP) on December 11, 2015. (Doc. 13 at 9; Dep. Of Jesus Castaneda (Castaneda Dep.) 94:18-22 [**admitted**].)

4.    Plaintiff transferred from HDSP to Kern Valley State Prison (KVSP) on January 6, 2016. (Doc. 13 at 9 [**admitted**].)

5.    During the events at issue in this case, Defendant J. Collins was employed as an Associate Warden at SATF. (Dec. of J. Collins (Collins Dec.) ¶ 1 [**admitted**].)

6.    During the events at issue in this case, Defendant A. Williams was employed as a Correctional Counselor II at SATF. (Dec. of A. Williams (Williams Dec.) ¶ 1 [**admitted**].)

7.    During the events at issue in this case, Defendant N. Peterson was employed as a Correctional Counselor II Supervisor at SATF. (Dec. of N. Peterson (Peterson Dec.) ¶ 1 [**admitted**].)

8.    During the events at issue in this case, Defendant J. Acebedo was employed as a Correctional Counselor II at KVSP. (Dec. of J. Acebedo (Acebedo Dec.) ¶ 1 [**admitted**].)

9.    During the events at issue in this case, Defendant C. Pfeiffer was employed as an Acting Warden at KVSP. (Dec. of C. Pfeiffer (Pfeiffer Dec.) ¶ 1 [**admitted**].)

10.    Plaintiff's medical records show that during his incarceration at SATF, he submitted numerous medical request forms and had regular contact with prison medical staff on a monthly basis. (Feinberg Dec. ¶ 9 [**admitted**].)

11.    Even if Plaintiff had not reported any assaults or physical injuries to his medical providers, Plaintiff's medical providers would have observed and documented any injuries when they physically examined Plaintiff and provided him with care for his other medical conditions. (Feinberg Dec. ¶ 9 [**disputed**, citing to Plaintiff, Bonty & Ramirez declarations].)

12.    There are no medical records showing Plaintiff ever reported or received medical

treatment for injuries related to being punched in the face, hit, kicked, slapped, pushed, or choked by his cellmates during his incarceration at SATF. (Feinberg Dec. ¶ 10 [**admitted**].)

13. If Plaintiff had been physically and sexually assaulted as he described in his deposition, he would have suffered and exhibited injuries that would be consistent with the assaults he described. (Feinberg Dec. ¶¶ 11-12 [**disputed**, citing to Plaintiff's declaration at ¶ 2].)

14. Medical staff physically examined Plaintiff on August 26, 2015, due to his Prison Rape Elimination Act (PREA) complaint and his placement in Administrative Segregation. (Feinberg Dec. ¶¶ 15-16; Feinberg Dec. Ex. B [**admitted**].)

15. During Plaintiff's physical examination on August 26, 2015, medical staff only found reddened areas around Plaintiff's neck and knees, and did not find any other injuries. Plaintiff also did not complain of any injuries during the physical examination. (Feinberg Dec. ¶ 16; Feinberg Dec. Ex. B [**admitted**].)

16. Plaintiff spoke with a staff psychologist on August 26, 2015, and told this psychologist that he had been anally raped every night by his cellmate at the time from April 20, 2015 to July 3, 2015; that he had been anally raped several nights between February 4, 2014, and April 19, 2014, by his cellmate at the time; that he was not being sexually abused by his current cellmate; that he did not have any safety issues; and that he did not want to be placed in Sensitive Needs Yard . (Feinberg Dec. ¶ 13; Feinberg Dec. Ex. B [**admitted**].)

17. Plaintiff's claim that he was physically or sexually assaulted on a daily basis during his incarceration at SATF is not supported by his medical records. (Feinberg Dec. ¶ 17 [**disputed**, citing to Plaintiff's declaration at ¶ 3].)

18. Counselor Williams did not receive or review any information indicating Plaintiff was being harmed or would be harmed by his current cellmate. (Williams Dec. ¶¶ 3-9; Castaneda Dep. 25:19-25, 26:1, 55:15-21, 56:25, 57:1-5, 58:2-10, 59:13-16, 63:2-14 [**disputed**, citing to Plaintiff's deposition at 55:17-25, 60:20-25, 61:1-25].)

19. Plaintiff did not tell Counselor Williams the names of the officers who were allegedly putting inmates into his cell to harm him. (Williams Dec. ¶ 3; Castaneda Dep. 60:13-19 [**admitted**].)

20. On August 21, 2015, Plaintiff appeared before a Unit Classification Committee conducted by Associate Warden Collins, Captain Hacker, and Counselor Williams. (Doc. 13 at 7; Castaneda Dep. 53:22-25; Williams Dec. ¶ 3; Williams Dec. Ex. A; Collins Dec. ¶ 2 [**admitted**].)

21. Associate Warden Collins did not receive or review any information indicating Plaintiff was being harmed or would be harmed by his current cellmate. (Collins Dec. ¶¶ 3-8; Castaneda Dep. 25:19-25, 26:1, 55:15-21, 56:25, 57:1-5 [**disputed**, citing to Plaintiff's deposition at 55:17-25 & Plaintiff's declaration at ¶ 4].)

22. During the August 21, 2015 committee hearing, Associate Warden Collins and Captain Hacker asked Plaintiff for more information about his current safety concerns. (Collins Dec. ¶ 5; Williams Dec. ¶ 6; Castaneda Dep. 54:11-25. 55:1-14 [**disputed**, citing to Collins Dec. ¶ 5, Williams Dec. without reference to a specific paragraph & Plaintiff's deposition at 30:17-21].)

23. During the August 21, 2015 committee hearing, Plaintiff did not answer Associate Warden Collins and Captain Hacker's questions about his current safety concerns. (Collins Dec. ¶ 5; Williams Dec. ¶ 6; Castaneda Dep. 54:17-25, 55:1-14 [**disputed**, citing to Plaintiff's deposition at 30:17-25 & Plaintiff's declaration without reference to a specific paragraph].)

24. During the August 21, 2015 committee hearing, Plaintiff did not provide Associate Warden Collins and Counselor Williams with any specific details or information about the inmates who had assaulted him or the officers involved. (Collins Dec. ¶ 5; Williams Dec. ¶ 6; Castaneda Dep. 33:22-25, 34:1-7, 55:4-21 [**disputed**, citing to Plaintiff's deposition at 55:17-21 & Plaintiff's declaration without reference to a specific paragraph].)

25. During the August 21, 2015 committee hearing, Plaintiff did not ask Associate Warden Collins and Counselor Williams to place him into the Administrative Segregation Unit (ASU), Sensitive Needs Yard (SNY), or protective custody due to his safety concerns. (Collins Dec. ¶ 5; Williams Dec. ¶ 6; Castaneda Dep. 128:15-23 [**disputed**, citing to Plaintiff's deposition at 30:17-25].)

26. Before interviewing Plaintiff on November 5, 2015, Counselor Peterson did not have any prior knowledge about the harm Plaintiff allegedly experienced at SATF. (Peterson Dec. ¶ 2;

1    Castaneda Dep. 86:22-25, 87:1-3 [**disputed**; citing to Peterson Dec. ¶ 3].)

2        27. During the November 5, 2015 interview, Plaintiff did not tell Counselor Peterson the

3    names of the inmates who had assaulted him, the dates the assaults occurred, or the identities of

4    the officers allegedly responsible for putting assaultive inmates into his cell. (Peterson Dec. ¶¶ 4-

5    5; Castaneda Dep. 85:14-24 [**disputed**, citing to Peterson Dec. ¶ 3].)

6        28. Counselor Peterson never spoke with Associate Warden Collins or Counselor

7    Williams about Plaintiff's safety concerns, Plaintiff's housing situation, or Plaintiff's upcoming

8    transfer to another institution. (Peterson Dec. ¶ 7; Castaneda Dep. 84:4-18 [**disputed**, citing to

9    Peterson Dec. ¶¶ 2-3].)

10       29. Plaintiff was never harmed during his incarceration at HDSP. (Castaneda Dep. 141:20-

11   25, 142:1-3; Doc. 13 at 9 [**admitted**].)

12       30. Associate Warden Collins, Counselor Williams, and Counselor Peterson did not have

13   the ability to affect Plaintiff's housing situation at HDSP or KVSP. (Collins ¶ 9; Williams ¶ 10;

14   Peterson Dec. ¶ 8 [**disputed**, citing to Plaintiff's deposition at 30:17-21, 84:7-12, 21-25].)

15       31. After Plaintiff transferred from SATF, Associate Warden Collins, Counselor

16   Williams, and Counselor Peterson did not direct or otherwise interfere with Plaintiff's housing

17   assignments at HDSP or KVSP. (Collins ¶ 9; Williams ¶ 10; Peterson Dec. ¶ 8 [**disputed**, citing

18   to Plaintiff's deposition at 103:4-9].)

19       32. Associate Warden Collins, Counselor Williams, and Counselor Peterson never

20   contacted Counselor Acebedo, Warden Pfeiffer, or any other staff member at KVSP in order to

21   harm Plaintiff. (Collins ¶ 9; Williams ¶ 10; Peterson Dec. ¶ 8; Acebedo Dec. ¶ 4 [**disputed**, citing

22   to Plaintiff's deposition at 103:4-9].)

23       33. Associate Warden Collins, Counselor Williams, and Counselor Peterson never

24   received or reviewed any information indicating Plaintiff faced a serious risk of harm from any

25   inmates at KVSP. (Collins ¶ 9; Williams ¶ 10; Peterson Dec. ¶ 8 [**disputed**, citing to Plaintiff's

26   deposition at 103:4-9].)

27       34. Before Plaintiff transferred to KVSP, Plaintiff had never spoke with or interacted with

28   Counselor Acebedo. (Acebedo Dec. ¶ 4; Castaneda Dep. 98:4-14 [**admitted**].)

35. Plaintiff never told Counselor Acebedo the identities of the specific cellmates who had assaulted him, the identities of specific inmates he believed were threatening him, the fact that his SATF cellmates were Southern Hispanic gang members, or the identities of the officers who allegedly placed assaultive inmates in his cell. (Acebedo Dec. ¶¶ 4, 6, 8; Castaneda Dep. 100:13-25, 101:1-15, 120:13-24 [**disputed**, citing to Bonty & Ramirez declarations].)

36. On January 14, 2016, Plaintiff appeared before a classification committee headed by Counselor Acebedo. (ECF No. 13 at 10; Castaneda Dep. 102:5-8; Acebedo Dec. ¶ 6 [**admitted**].)

37. After the January 14, 2016 hearing, Counselor Acebedo did not take any actions to affect Plaintiff's housing assignment or cellmate assignment besides drafting a confidential memorandum recommending Plaintiff be released back to Facility A. (Acebedo Dec. ¶¶ 6, 8 [**disputed**, citing to Bonty & Ramirez declarations].)

38. On January 21, 2016, Plaintiff appeared before a classification committee headed by Warden Pfeiffer. (ECF No. 13 at 10; Castaneda Dep. 109:18-25, 110:1, 114:4-6, 117:3-24, 122:20-25, 123:1; Pfeiffer Dec. ¶ 2 [**admitted**].)

39. Plaintiff was never physically or sexually assaulted while he was housed at KVSP Facility A. (Castaneda Dep. 110:14-19, 135:11-15, 137:18-22 [**disputed**, citing to Plaintiff's declaration at ¶ 8].)

40. Plaintiff never communicated to Counselor Acebedo and Warden Pfeiffer that he was afraid of his KVSP cellmate or that his KVSP cellmate had threatened to harm him. (Castaneda Dep. 110:8-13, 141:12-19; Acebedo Dec. ¶ 8; Pfeiffer Dec. ¶ 5 [**disputed**, citing to Plaintiff's deposition at 118:23-25, 119:13-25].)

## IV.   LEGAL STANDARDS

### A.   Summary Judgment

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014) ("If there is a genuine dispute about material facts, summary judgment will not be granted"). The moving party "initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec.*

1  *Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

2  (1986)). The moving party may accomplish this by "citing to particular parts of materials in the

3  record, including depositions, documents, electronically stored information, affidavits or

4  declarations, stipulations …, admissions, interrogatory answers, or other materials," or by

5  showing that such materials "do not establish the absence or presence of a genuine dispute, or that

6  an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P.

7  56(c)(1)(A), (B). If the moving party moves for summary judgment on the basis that a material

8  fact lacks any proof, the Court must determine whether a fair-minded jury could reasonably find

9  for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere

10  existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there

11  must be evidence on which the jury could reasonably find for the plaintiff"). When the non-

12  moving party bears the burden of proof at trial, "the moving party need only prove that there is an

13  absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387

14  (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B).

15       Summary judgment should be entered against a party who fails to make a showing

16  sufficient to establish the existence of an element essential to that party's case, and on which that

17  party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322. "[A] complete failure of

18  proof concerning an essential element of the nonmoving party's case necessarily renders all other

19  facts immaterial." *Id.* at 322–23. In such a circumstance, summary judgment should be granted,

20  "so long as whatever is before the district court demonstrates that the standard for the entry of

21  summary judgment … is satisfied." *Id.* at 323.

22       In reviewing the evidence at the summary judgment stage, the Court "must draw all

23  reasonable inferences in the light most favorable to the nonmoving party." *Comite de Jornaleros*

24  *de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011). It need only

25  draw inferences, however, where there is "evidence in the record ... from which a reasonable

26  inference ... may be drawn...;" the Court need not entertain inferences that are unsupported by

27  fact. *Celotex*, 477 U.S. at 330 n.2 (citation omitted). Additionally, "[t]he evidence of the non-

28  movant is to be believed...." *Anderson*, 477 U.S. at 255. In judging the evidence at the summary

1    judgment stage, the Court does not make credibility determinations or weigh conflicting

2    evidence. *Soremekun v. Thrifty Payless, Inc*., 509 F.3d 978, 984 (9th Cir. 2007).

3         **B. Deliberate Indifference to Serious Risk of Harm**

4         "The Eighth Amendment imposes a duty on prison officials to protect inmates from

5    violence at the hands of other inmates." *Cortez v. Skol*, 776 F.3d 1046, 1050 (9th Cir. 2015)

6    (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). Prison officials only act with deliberate

7    indifference when the following two requirements are met: (1) the objective requirement that the

8    deprivation be "objectively, sufficiently serious," and (2) the subjective requirement that the

9    prison official had a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. at 833-

10   834. Prison officials can violate the constitution if they are "deliberately indifferent" to a serious

11   risk of harm to the inmate. *Id.* at 834; *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Cortez v. Skol*,

12   776 F.3d at 1050. To be liable for "deliberate indifference," a prison official must "both be aware

13   of facts from which the inference could be drawn that a substantial risk of serious harm exists,

14   and he must also draw the inference." *Farmer*, 511 U.S. at 837. "[A]n official's failure to alleviate

15   a significant risk that he should have perceived but did not, while no cause for commendation,

16   cannot ... be condemned as the infliction of punishment." *Id*. at 838. Allegations of negligence do

17   not suffice. *Estelle v. Gamble*, 429 U.S. at 105-06; *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir.

18   2000).

19   **V.    SUMMARY OF THE PARTIES' ARGUMENTS**

20        Defendants contend summary judgment is appropriate in this action because (1) Plaintiff's

21   claims for damages for his mental and emotional injuries are barred by the PLRA because

22   Plaintiff cannot demonstrate physical injury; (2) there is no evidence Defendants Collins or

23   Williams acted with deliberate indifference to serious risk of harm to Plaintiff while he was

24   incarcerated at SATF in August 2015; (3) there is no evidence Defendants Collins, Williams or

25   Peterson were deliberately indifferent to Plaintiff's safety concerns after he was transferred to

26   KVSP; (4) there is no evidence Defendant Peterson was deliberately indifferent to Plaintiff's

27   safety concerns regarding a transfer to HDSP; (5) there is no evidence Defendants Acebedo or

28   Pfeiffer acted with deliberate indifference to a serious risk of harm to Plaintiff while he was

1   incarcerated at KVSP; and (6) all Defendants are entitled to qualified immunity. (Doc. 75-2 at 10-

2   30.)

3          In his opposition, Plaintiff addresses the August 21, 2015 classification committee

4   hearing, his medical records, his interview with Defendant Peterson on November 5, 2015, the

5   classification hearing of January 14, 2016, and an Ad Seg classification hearing of January 21,

6   2016, and asserts the following arguments: (1) his injuries were more than *de minimis* as

7   documented and he could not make any further showing "without getting into trouble"; (2)

8   Defendants Collins, Hacker[3] and Williams acted with deliberate indifference; (3) Defendants

9   Collins, Williams and Peterson acted with deliberate indifference concerning Plaintiff's transfer

10  to HDSP; (4) Defendant Peterson was deliberately indifferent; (5) Defendants Acebedo and

11  Pfeiffer acted with deliberate indifference to a serious risk of harm to Plaintiff; (6) Defendants

12  Pfeiffer, Collins, Williams and Peterson "took steps to have Plaintiff hurt or killed"; and (7)

13  Defendants Collins, Williams, Peterson and Acebedo violated Plaintiff's clearly established

14  constitutional right. (Doc. 81 at 14-23.) In a heading entitled "Protective Custody/Sensitive Needs

15  Yard," Plaintiff contends that while Defendants claim "there was nothing they could do" because

16  Plaintiff was unable to identify any inmate posing a threat, "[t]he threat has always been, and

17  remains being [sic], staff. Plaintiff refused to assist staff in covering up their crimes and even

18  filed a law suit [sic] against these very officers," citing to an action pending in the Fresno County

19  Superior Court. (*Id.* at 23.) Plaintiff contends that while currently housed at the R.J. Donovan

20  Correctional Facility, "agents acting for the" Defendants "openly tell" Plaintiff they will be

21  placing predators into his cell. (*Id.* at 24-25.) He claims "[t]his cycle is being repeated over and

22  over again." (*Id.* at 24.) In conclusion, Plaintiff contends "[i]ndisputable evidence shows that

23  defendants were deliberately indifferent to a serious risk of harm." (*Id.* at 25.)[4]

24         In their reply brief, Defendants contend (1) Plaintiff's unpled claims should be

25  disregarded because they are raised for the first time at summary judgment; (2) Plaintiff's new

---

26  [3] Defendant Hacker was dismissed from this action in the Order Adopting Findings and Recommendations
27  issued by District Judge Dale A. Drozd on March 18, 2020. (Doc. 68.) Thus, Plaintiff's arguments
    regarding dismissed Defendant Hacker were not considered.

28  [4] Unpled and/or new claims were not considered by this Court.

1  factual allegations should be disregarded because they are raised for the first time at summary

2  judgment; (3) Plaintiff's opposition relies on factual allegations that are not supported by any

3  evidence in the record; and (4) Defendants are entitled to summary judgment. (Doc. 89.)

4  **VI.    DISCUSSION**

5       **A.  Damages for Mental and Emotional Injuries & the PLRA**

6       Initially, Defendants contend Plaintiff's claims for damages as a result of mental and

7  emotional injuries are barred by the Prison Litigation Reform Act ("PLRA") because Plaintiff

8  cannot demonstrate physical injury. (Doc. 75-2 at 16.)  Defendants contend indisputable evidence

9  shows Plaintiff did not experience more than a *de minimis* injury.  Defendants reason that while

10  Plaintiff testified he had been physically and sexually assaulted by his cellmate while incarcerated

11  at SATF and his cellmate at KVSP ordered Plaintiff not to leave the cell, Plaintiff's admission

12  that he was never physically attacked or injured after meeting with Defendants Collins and

13  Williams on August 21, 2015, means Plaintiff only experienced anxiety, depression, PTSD and

14  suicidal ideation. (*Id*.) Defendants further contend Plaintiff's medical records establish Plaintiff

15  did not experience the physical and sexual assaults Plaintiff alleged during his deposition. (*Id*. at

16  16-17.) Because Plaintiff admits he did not suffer economic loss associated with his mental and

17  emotional injuries, and because he is not seeking injunctive relief and indicated he would be

18  satisfied with a declaratory judgment that Defendants had violate his civil rights, Plaintiff's

19  remaining remedy is money damages for those mental and emotional injuries. (*Id*. at 17.)

20  Defendants again conclude, "[b]ecause indisputable evidence shows Plaintiff did not suffer *any*

21  physical injury, much less a *de minimis* injury, Plaintiff's claims for damages against Warden

22  Pfeiffer, Associate Warden Collins, and Counselors Williams, Peterson, and Acebedo based on

23  his mental and emotional injuries are barred under the PLRA." (*Id.*, italics in original.)

24       In his opposition, Plaintiff contends his "physical injuries were not documented," and

25  somewhat contradictorily, alleges documentation provided by Defendants shows "bruises around

26  the neck and knees (More than de minimis) as well as '…bumps in his perirectal and rectal area

27  …' which warranted a diagnosis for 'poss rectal lesions …'." (Doc. 81 at 14-15.) Plaintiff

28  contends a Primary Care Progress Note dated April 11, 2014, reflects an exam that "took place

1   while plaintiff was being sexually assaulted by a cellmate (2/4/14-4/19/14)." (*Id*. at 15.) Plaintiff

2   contends he was denied the ability to eat, sleep, drink and receive mental health treatment while

3   he "was held hostage at KVSP." (*Id*.) Plaintiff states that he "could not show any injuries to any

4   staff without getting in trouble," citing to the Declarations of inmates Bonty & Ramirez. (*Id*.) He

5   contends the reason there is reference to bruises on his knees "is because that is how far plaintiff

6   could roll up his pants without assistance." (*Id*.) Plaintiff contends he has "suffered physical,

7   emotional and psychological injuries beyond measure" and that those "injuries began at [Pleasant

8   Valley State Prison] on 2/7/10 and have followed plaintiff from prison to prison." (*Id*. at 16.)

9      In their reply, Defendants reiterate their position, challenge Plaintiff's specific assertions,

10   and conclude that because Plaintiff has failed to submit admissible evidence showing he suffered

11   any physical injury, such that a fair-minded jury could find for Plaintiff, summary judgment

12   should be granted "on Plaintiff's claims for damages based on his mental and emotional injuries."

13   (Doc. 89 at 11-13.)

14      As noted above, this action proceeds on claim 2 of Plaintiff's first amended complaint

15   alleging deliberate indifference to serious risk of harm in violation of the Eighth Amendment.

16   Plaintiff requested compensatory and punitive damages, and injunctive relief, as to his claim. (*See*

17   Doc. 13 at 19.)

18      The Court must determine whether Plaintiff has demonstrated a physical injury and

19   whether that injury is more than *de minimis*. Defendants contend Plaintiff has not established any

20   physical injury. Plaintiff contends he has established physical injuries, including bruising and

21   bumps or possible lesions in his perirectal and rectal area.

22      Dr. Feinberg's declaration in support of defendants' summary judgment motion provides

23   the following:

> In my review of Plaintiff's medical records, I found no record showing Plaintiff ever reported or received medical treatment for injuries related to being punched in the face, hit, kicked, slapped, pushed, or choked by his cellmates during his incarceration at SATF. I also found no record showing Plaintiff ever reported or received medical treatment for injuries related to being sexually assaulted during his incarceration at SATF.

14

(Doc. 75-9 at 3, ¶ 10.) The declaration further states:

> During my review of Plaintiff's medical records, I only found one record where Plaintiff ever complained of any injury to his rectal area. An April 11, 2014, Primary Care Provider Progress Note reflects that Plaintiff was seen by medical staff regarding his request for sun screen, and his complaints of having memory problems and feeling bumps in his perirectal and rectal area for the past 2 months. There is no indication that Plaintiff complained about being raped or physically assaulted during this examination.

(*Id.* at ¶ 14.) Plaintiff points to Exhibit B to Feinberg's declaration to support his claim of physical injuries for sexual assault. Exhibit B includes a document dated August 26, 2015, prepared by SATF Staff Psychologist M. Avila. It states, in relevant part: "[Castaneda] also stated that he was forced to endure anal sex several nights between the dates of 2/4/14 and 4/19/14 by his cellmate at that time." (Doc. 75-9 at 9.) Exhibit B also includes a Primary Care Progress Note dated April 11, 2014 by J. Metts, M.D. It reports Plaintiff's complaint of feeling "bumps in his perirectal and rectal area … for the past 2 months," indicates a rectal exam was not conducted, and indicates a diagnosis of "poss rectal lesions" and a plan of "RTC for rectal exam." (Doc. 79-9 at 10; *see also* Doc. 81 at 38 [same].)

In *Oliver v. Keller*, 289 F.3d 623 (9th Cir. 2002), the Ninth Circuit interpreted § 1997e(e) requiring plaintiffs to show a "physical injury" before they can assert mental or emotional injury claims. The *Oliver* court noted that "the phrase 'physical injury' does not wear its meaning on its face" and that, "[i]n drafting § 1997e(e), Congress failed to specify the type, duration, extent, or cause of 'physical injury' that it intended to serve as a threshold qualification for mental and emotional injury claims." *Oliver*, 289 F.3d at 626. After surveying prior case law, the *Oliver* court held "that for all claims to which it applies, 42 U.S.C. § 1997e(e) requires a prior showing of physical injury that need not be significant but must be more than *de minimis*."[5] *Id.* at 627. Applying this standard to the facts before it, the Ninth Circuit found that an inmate's back and leg pain, which the inmate described as "nothing too serious," and canker sore were "not more than *de minimis*." *Id.* at 629.

---

[5] *De minimus* is defined as "Trifling; negligible" or "so insignificant that a court may overlook it in deciding an issue or case." *De Minimus* Definition, Black's Law Dictionary (11th ed. 2019), *available at* Westlaw.

1    Neither *Oliver* nor other Ninth Circuit decisions address the PLRA's physical injury

2    requirement in the context of claims based on a sexual assault. However, the Second Circuit and

3    several federal district courts have done so. These courts "applied a 'common sense' approach

4    and found that sexual assault qualified as 'more than a *de minimis* injury[.]'" *Cleveland v. Curry*,

5    No. 07–cv–02809–NJV, 2014 WL 690846, at *6 (N.D. Cal. Feb. 21, 2014) (citing *Liner v.*

6    *Goord*, 196 F.3d 132, 135–36 (2d Cir.1999) (while there is no "statutory definition of 'physical

7    injury'" in the PLRA, the "alleged sexual assaults qualify as physical injuries as a matter of

8    common sense. Certainly, the alleged sexual assaults would constitute more than a *de minimis*

9    injury if they occurred"); *Carrington v. Easley*, No. 5:08–CT–3175–FL, 2011 WL 2132850, at *3

10   (E.D.N.C. May 25, 2011) (holding on default judgment in case where plaintiff alleged a guard

11   ordered him to undergo strip search and unsuccessfully attempted to fellate him that "a sexual

12   assault qualifies as a 'physical injury' under the PLRA.... [E]ven absent physical injury, sexual

13   assault is an injury of 'constitutional dimensions' as to which the PLRA does not bar recovery");

14   *Marrie v. Nickels*, 70 F.Supp.2d 1252, 1257 (D. Kan. 1999) (holding in case where guard was

15   alleged to have stroked the buttocks and genitalia of inmates during frisk search that such "sexual

16   assaults would qualify as physical injuries under § 1997e(e)")). *See also Kahle v. Leonard*, 563

17   F.3d 736, 741-42 (8th Cir. 2009); *Berryhill v. Schriro*, 137 F.3d 1073, 1076 (8th Cir. 1998)

18   ("Certainly, sexual or other assaults are not a legitimate part of a prisoner's punishment, and the

19   substantial physical and emotional harm suffered by a victim of such abuse are compensable

20   injuries").

21    Here, there exists a disputed material fact as concerns whether Plaintiff was sexually

22   assaulted by a cellmate. Defendants contend that because Plaintiff's medical records do not reveal

23   evidence of sexual assault, Plaintiff's claim is barred by the PLRA. Plaintiff contends he was

24   sexually assaulted by his cellmate but did not report the assaults or seek medical care to avoid

25   retaliation by other inmates. The conduct Plaintiff alleged— sexual assault or rape by a

26   cellmate—meets the applicable definition of sexual assault. 18 U.S.C. § 2246(2).[6] Further, the

27   ───────────────

28   [6] 18 U.S.C. § 2246(2)(C) defines "sexual act" to include "the penetration, however slight, of the anal or
     genital opening of another by hand or finger or by any object, with an intent to abuse, humiliate, harass,
     degrade, or arouse or gratify the sexual desire of any person."

1   sexual assaults are alleged to have occurred repeatedly. Given this factual dispute, the

2   determination of whether a sexual assault occurred is a factual question for the jury, and the

3   factfinder could determine sexual assault and physical injury occurred even in the absence of

4   medical records. Therefore, summary judgment on this basis should be denied.

5               **B.  Defendants Collins & Williams: SATF August 2015/Serious Risk of Harm**

6               Defendants Collins and Williams contend summary judgment should be granted in their

7   favor because Plaintiff did not face an objectively serious risk of harm from his SATF cellmate in

8   August 2015, there is no medical evidence establishing assaults, and because no fair-minded

9   factfinder could conclude Plaintiff had actually been assaulted by his cellmate after his August

10  2015 classification hearing. (Doc. 75-2 at 18-19; Doc. 89 at 13-14.) Plaintiff contends Collins and

11  Williams were deliberately indifferent because Plaintiff advised Williams before, and both

12  Collins and Williams during, a committee hearing, that he was being assaulted by his cellmate.

13  The UCC responded by threatening worse punishment should Plaintiff report those assaults.

14  Following the hearing, Plaintiff was assaulted for four days by that cellmate. Plaintiff alleges

15  defense exhibits establish Plaintiff had bruising around his neck and on his knees. Plaintiff

16  contends that while he was "not raped by that cellmate, the behavior is still classified as sexual

17  assault." (Doc. 81 at 17.)

18              Defendants cite to their undisputed facts numbers 10 through 17 in support of their

19  argument. Plaintiff disputes numbers 11, 13 and 17, specifically referencing his declaration to

20  dispute Defendants' assertions.

21              As to number 11, Plaintiff cites to his declaration without providing a specific paragraph

22  number. A review of Plaintiff's declaration regarding whether "[e]ven if Plaintiff had not reported

23  any assaults or physical injuries to his medical providers, Plaintiff's medical providers would

24  have observed and documented any injuries when they physically examined Plaintiff and

25  provided him with care for his other medical conditions," reveals the following:

26              1.  Prior to the August 21, 2015, Unit Classification Committee
                    (UCC) I informed defendant Williams that I had been assaulted
27                  by inmates placed into my cell, that my current cellmate was
                    harming me and that I wanted it to stop.

28

17

2. Pursuant to inmate rules, I was not able to allow any staff members to see any injurys [sic] caused by my cellmates. I had to hide them and keep them hidden. If an injury was seen by staff, I would have had to dismiss it as an accident I caused myself.

3. When I did report any injuries I was not able to blame anyone for them. I did report tears to my rectum, a dislocated hip and shoulder injuries to medical staff.

4. During the August 21, 2015 UCC, I told all of the members that my current cellmate was harming me and that I wanted it to stop.

(Doc. 81 at 34-35.)

As to number 13—that if Plaintiff had been physically and sexually assaulted as he described in his deposition, he would have suffered and exhibited injuries that would be consistent with the assaults he described—Plaintiff cites to his declaration, paragraph 2, to dispute Defendants' assertion. Paragraph 2 explains why any injuries Plaintiff may have suffered were not exhibited.

As to number 17— that Plaintiff's claim that he was physically or sexually assaulted on a daily basis during his incarceration at SATF is not supported by his medical records —Plaintiff cites to paragraph 3 of his declaration to dispute Defendants' assertion. Paragraph 3 explains why there are no medical records to support Plaintiff's claim of physical and sexual assault.

Defendants cite to *Scott v. Harris*, 550 U.S. 372 (2007) and *Law v. Gripe*, No. 2:16-cv-1830-GEB-EFB P, 2018 WL 1453199, at *11 (E.D. Cal. Mar. 22, 2018). While *Scott* stands for the proposition that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment" (*id*. at 380), here, the differing stories are not similarly "blatantly contradicted." In *Scott*, the Supreme Court further explained the discrepancy:

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

(*Id*. at 380-381.)  Here, the Court does not find that Plaintiff's version of the events "is so utterly

18

1    discredited by the record that no reasonable jury could have believed him." Credibility is key in

2    this circumstance and that is a call for a jury to make. The Court does not find a blatant

3    contradiction on this record.

4            In *Law v. Gripe*, the Court considered plaintiff's claim alleging sexual assault by a

5    correctional officer in violation of the Eighth Amendment on summary judgment. This Court

6    finds *Law* distinguishable.  The Court held as follows:

> Rubino argues that the undisputed evidence establishes that he could not have sexually assaulted plaintiff at approximately 2:00 a.m. on June 24, 2016 as plaintiff claims. He has submitted electronic records from Rounds Tracker showing that he stopped at each cell around 2:00 a.m. that morning only for about 3 seconds. He further argues that plaintiff's medical records belie plaintiff's claim that his penis was swollen and bleeding. On the other hand, as Rubino points out, plaintiff has offered no evidence in opposition to summary judgment other than his own, self-serving assertion that Rubino assaulted him. But the motion for summary judgment still requests that plaintiff's credibility be rejected, a task for which summary judgment is inappropriate. The Rounds Tracker evidence certainly makes it unlikely that Rubino could have assaulted plaintiff during the interval of 2:03 to 2:05 a.m. when he was touching the sensor unit to each cell, it does not establish what Rubino was doing prior to or after those checks. Thus, the Tracker evidence will make it difficult for a fact finder at trial to credit plaintiff's testimony that the sexual contact occurred, that evidence alone does not preclude a jury from doing so. In that sense, the Tracker evidence is not the kind of video evidence that was present in  *Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), on which defendant relies. In fact, Rubino has made no accounting for his time before and after the 2:00 a.m. cell checks. *See* ECF No. 84–10 (Rubino Decl.).
>
> The medical records and medical declaration provided by Dr. Feinberg are more problematic for plaintiff, particularly when viewed in combination with the Tracker evidence. There is simply no medical evidence, at all, that plaintiff sustained any injury to his penis on June 24, 2016. The record contains only plaintiff's allegation. All medical providers who examined plaintiff's penis found no abnormality. Plaintiff did not pursue treatment for his claimed injuries. *See* ECF No. 81 at 29. Further, even assuming the sexual contact occurred, plaintiff testified that the alleged contact with Rubino felt pleasurable at the time. *Id*. at 25. This evidence starkly contradicts plaintiff's claim that his penis was so injured by the contact that he experienced "injury, pain, bleeding, and suffering" for 12 to 14 months. *See id*. at 28. In short, plaintiff has provided conflicting accounts of what occurred which simply cannot be reconciled. It strains credulity that plaintiff would have viewed the sexual contact as pleasurable while it occurred if he were being subjected to such force as would cause the injuries he claims to have sustained— injuries for which there is no medical corroboration. And these conflicting accounts are further tempered by Tracker evidence

19

1
2
3

> indicating a strong improbability that there could have been time for
> the event to occur as plaintiff has alleged. Viewing the evidence in
> the light most favorable to plaintiff does not mean ignoring plaintiff's
> own conflicting accounts nor ignoring all other evidence adverse to
> plaintiff.

4   *Law v. Gripe*, 2018 WL 1453199 at \*11. Unlike *Law*, this record does not include other evidence

5   in addition to insupportable medical record evidence. Moreover, the plaintiff in *Law* did not

6   allege that the lack of supporting medical record evidence was due to a fear of retaliation by other

7   inmates were the assaults reported—as Plaintiff has done here. In *Law*, the lack of "medical

8   corroboration," plaintiff's testimony that he derived pleasure from the incident, and other

9   evidence "indicating a strong improbability" that events occurred as the plaintiff alleged, weighed

10  in favor of summary judgment for the defendant. Here, however, the Court finds it at least

11  probable that a jury could find Plaintiff's testimony credible that assaults occurred, and that

12  Plaintiff could not seek medical treatment for them.

13       Defendants also cite to Plaintiff's deposition testimony in support of their argument. (Doc.

14  75-2.)  The Court has reviewed the entire deposition transcript and concludes that while there

15  appears to be contradictory testimony offered by Plaintiff as to whether he was assaulted by his

16  cellmate following the committee hearing (*see* Castaneda Dep. at 66-68 and 73 [assaultive

17  conduct occurred] *cf*. 141-142 [not attacked]), this case is not one where "no fair-minded jury

18  could conclude Plaintiff was actually being assaulted by his cellmate every day after August 21,

19  2015," as Defendants assert. The questions posed at pages 66 through 68 were specific and clear

20  as to timing and location, whereas the question posed at pages 141 through 142 was compound

21  and unclear: "So throughout our conversation here today discussing what happened at SATF, at

22  High Desert State Prison, and at Kern Valley State Prison, we discussed how you had previously

23  been attacked before you had spoke to Hacker, Collins, and Williams. [¶] Do you recall - - it

24  doesn't sound like you had any - - you were ever attacked or injured any time afterwards, is that

25  right?"

26       In sum, the Court concludes there is exists a material dispute as to whether a jury could

27  return a verdict in Plaintiff's favor, finding he was harmed following the committee hearing,

28  despite a lack of medical evidence to support his assertions of physical injury.  As a result,

1    summary judgment should be denied.

2          **C.  Defendants Collins & Williams: SATF August 2015/Deliberate Indifference**

3          Defendants next contend Collins and Williams were not deliberately indifferent to a

4    serious risk of harm from Plaintiff's cellmate. Defendants contend Plaintiff "only alleges he told

5    Counselor Williams and Associate Warden Collins that correctional staff were placing inmates in

6    his cell to hurt him," and even if true, did not put them on notice that the issue "extended to his

7    current cellmate," and that Plaintiff did not provide sufficient information that would have

8    allowed Collins and Williams to identify Plaintiff's safety concerns regarding that cellmate. (Doc.

9    75-2 at 19.) Plaintiff refused an offer to be placed in Ad Seg, did not ask to be placed in Ad Seg

10   during the committee hearing, and conceded he did not know what information Collins had prior

11   to the hearing. (*Id*. at 19-20.) Defendants further note Plaintiff "directly" admitted he has no

12   evidence Collins and Williams were aware of his safety concerns before the hearing, and there is

13   no evidence they received any information that Plaintiff was being harmed by his cellmate

14   following the hearing. (*Id*. at 20.)  In his opposition, Plaintiff contends Collins and Williams

15   "heard and witnessed the same things," and that neither "acted except to threaten [him] to not

16   report any assaults." (Doc. 81 at 17-18.)

17         To be liable for "deliberate indifference," a prison official must "both be aware of facts

18   from which the inference could be drawn that a substantial risk of serious harm exists, and he

19   must also draw the inference." *Farmer*, 511 U.S. at 837.

20         In support of the motion for summary judgment, Defendant Collins declares, in pertinent

21   part, that: (1) he chaired a classification committee hearing on August 21, 2015, to conduct an

22   annual review of Plaintiff's custody status and housing assignment; (2) before the hearing,

23   Collins had never received or reviewed any information indicating Plaintiff was being harmed by

24   other inmates or staff at SATF; (3) Plaintiff asked for single cell status, stating he had been

25   assaulted by inmates in the past and had not reported the assaults for fear that reporting would

26   spread throughout the facility; (4) Plaintiff did not provide the committee with specific details or

27   information about those past assaults; (5) Plaintiff did not indicate the assaults were ongoing; (6)

28   Plaintiff did not state or otherwise indicate to the committee that correctional staff were trying to

harm him by housing him with violent inmates; (7) Plaintiff did not tell the committee he was
concerned officers would continue to try to harm him by housing him with violent inmates if he
did not receive single cell status; (8) Collins explained Plaintiff did not qualify for single cell
status and asked Plaintiff if he had any current safety concerns regarding housing and to explain
or provide more information about his current housing and safety concerns; (9) Captain Hacker
also advised Plaintiff he did not qualify for single cell status and asked Plaintiff whether he
wanted to be placed in Ad Seg; (10) Plaintiff replied to these inquiries by stating he did not want
to be placed in Ad Seg, refused to elaborate on his safety concerns, and indicated several times he
would go back to his assigned yard; (11) the committee elected to continue double celling
Plaintiff; (12) Collins never told Plaintiff he would make sure he would be stabbed by other
inmates if he reported correctional officers were placing inmates into Plaintiff's cell to hurt him,
nor did he threaten to harm Plaintiff in any way, at any time; (13) Collins did not take any action
to have Plaintiff harmed before, during or after the hearing, nor did he direct others to do so; (14)
Collins had no further contact with Plaintiff; and (15) Collins does not have the authority to affect
Plaintiff's housing at other institutions, and he never contacted Defendants Acebedo or Pfeiffer,
or any other staff at KVSP, in order to harm Plaintiff. (Doc. 75-4 at 1-3, ¶¶ 2-9.)

Defendant Williams provides the following declaration, in relevant part, in support of the
motion for summary judgment: (1) Williams participated in the classification committee hearing
of August 21, 2015; (2) Williams never received or reviewed any information indicating Plaintiff
was being harmed by his cellmates or correctional staff at SATF; (3) Williams spoke with
Plaintiff several days or weeks before the hearing for a "pre-hearing interview," but Plaintiff
never informed Williams he was being harmed by his cellmates or that he was being harmed by
correctional staff; (4) during the pre-interview hearing, Williams never told Plaintiff he should
not report being harmed by correctional staff, nor did Williams tell Plaintiff other inmates would
harm him if he reported harm by cellmates or correctional staff, and Williams made no attempt to
discourage Plaintiff from reporting any harm; (5) Plaintiff asked for single cell status during the
classification committee hearing, stating he had been assaulted by inmates in the past and had not
reported the assaults for fear that reporting would spread throughout the facility; (6) Plaintiff did

22

not provide the committee with specific details or information about those past assaults; (7) Plaintiff did not indicate the assaults were ongoing; (8) Plaintiff did not state or otherwise indicate to the committee that correctional staff were trying to harm him by housing him with violent inmates; (9) Plaintiff did not tell the committee he was concerned officers would continue to try to harm him by housing him with violent inmates if he did not receive single cell status; (10) Williams observed Captain Hacker and Defendant Collins question Plaintiff during the hearing, asked Plaintiff about current safety concerns and that Plaintiff provide additional information about those safety concerns; (11) in response, Plaintiff stated he did not wish to go to Ad Seg and did not have any current safety concerns; (12) Plaintiff never indicated to the committee he faced an imminent threat of being harmed; (13) Williams does not recall Defendant Collins ever threatening Plaintiff with harm during the hearing; (14) the committee elected to continue Plaintiff's double cell status; (15) Williams recorded the committee's notes as the hearing took place and those notes were incorporated into a Classification Committee Chrono; (16) Williams never threatened to harm Plaintiff in any way before, during or after the hearing; (17) Williams never took action to have Plaintiff harmed before, during or after the hearing, nor directed any other correctional staff to take action to have Plaintiff harmed before, during or after the hearing; (18) after the hearing, Plaintiff never informed Williams he was being harmed by his current cellmate or that he was being harmed by correctional staff; (19) Williams does not have the authority to affect Plaintiff's housing at another institution, and never contacted Defendants Acebedo or Pfeiffer, or any other staff at KVSP, in order to harm Plaintiff; and (20) Williams never received or reviewed any information indicating Plaintiff faced a serious risk of harm from other inmates at KVSP. (Doc. 75-7 at 1-4, ¶¶ 2-10.)

Plaintiff testified at his deposition that he told Defendant Collins "that corrections officers were placing inmates into my cell to hurt me." (Castaneda Dep., at 32.) According to Plaintiff, Collins responded that if Plaintiff were to report the assaults, Collins "was going to make sure that [Plaintiff got] stabbed by other inmates," "that [Collins] was going to have them stab" Plaintiff. (*Id.*) The discussion occurred during the committee hearing, and "went on for quite a few minutes." (*Id.*) When asked whether he identified specific inmates during the hearing,

23

Plaintiff testified he "didn't have a chance to get into any specifics before they issued the threat to me and the conversation ended immediately thereafter." (*Id*. at 34.) Regarding the correctional officers who were placing inmates in Plaintiff's cell, Plaintiff believed those officers could be identified, as they were the "officers who conducted cell moves" (*id*.) and while he did not remember the names of the inmates who harmed him, Plaintiff testified he "made sure [he] documented this in administrative appeals to preserve it on the record" (*id*. at 35). Plaintiff also testified at his deposition that before the committee hearing, he told Defendant Williams that "correctional officers were putting inmates in [his] cell to assault [him]" (*id*. at 60) and while he did not identify those inmates by name, Plaintiff believed he "told her that it was happening at that time" (*id*. at 60, 65). Defendant Williams told Plaintiff not to report the assaults. (*Id*. at 60-61, 65.)

In Plaintiff's declaration in support of his opposition to Defendants' motion for summary judgment, Plaintiff declares he "informed defendant Williams that [he] had been assaulted by inmates placed into [his] cell, that [his] current cellmate was harming [him] and that [he] wanted it to stop." (Doc. 81 at 34, ¶ 1.)

Defendants' contention centers on the fact Plaintiff did not identify his current cellmate, and therefore, Collins and Williams would not have been on notice "that this issue extended to his current cellmate." An inference, however, can be drawn from Plaintiff's testimony that his reports of physical and sexual assault were ongoing and would have included his current cellmate. At his deposition, Plaintiff testified he told Williams prior to the committee hearing that "correctional officers were putting inmates" into his cell to assault him, and "that it was happening at that time." (Castaneda Dep., at 60:15-23.) Williams told Plaintiff not to report it. (*Id*. at 60:24-25.) Plaintiff told Williams he "wanted it stopped." (*Id.* at 60:4-6.) Williams told Plaintiff he "was going to be seriously hurt" if he reported these incidents, and that Plaintiff "knew that happened because it's happened to inmates before." Plaintiff acknowledged that but explained to Williams that "nothing could be worse than what's happening to [him] right now and [he wanted] to report it and [he wanted] it to stop." (*Id*. at 61:13-21; *see also* 65:11-14.) Plaintiff further testified that during the committee hearing, Williams "pretended not to remember" their prior conversation at

1    all. (*Id*. at 63:15-16.) After Williams read a prepared statement concerning Plaintiff's program,

2    the committee asked if Plaintiff had any questions and Plaintiff "stopped Ms. Williams right

3    there," referenced their prior conversation and his intent to discuss that conversation "openly in

4    the committee." (*Id.* at 63:25-64:8.) Plaintiff reminded Williams about officers putting inmates in

5    his cell and Williams "continued to pretend like she was not aware or didn't remember the

6    conversation." (*Id*. at 64:11-14.)

7         Regarding Defendants' contention that Plaintiff "directly admits he has no evidence" that

8    Collins and Williams were aware of Plaintiff's safety concerns before or after the committee

9    hearing, a review of Plaintiff's deposition testimony reveals Plaintiff qualifies his admission that

10   he has no *other* evidence of Defendants' awareness. (*See, e.g.*, Castaneda Dep., at 94:3-6.) It

11   therefore appears that Plaintiff believes "their lack of surprise regarding the circumstances" is

12   some evidence that Defendants were on notice of the issue. Defendants' citations to their

13   undisputed material fact numbers 18, 21 and 23 through 25 are also unpersuasive. Plaintiff

14   disputes each of those facts, citing to other portions of his own deposition testimony or to his

15   declaration in support of his opposition to this motion.

16        The Court does not make credibility determinations or weigh conflicting evidence when

17   considering Defendants' motion. Based on the foregoing, there is exists a material dispute as to

18   whether a jury could return a verdict in Plaintiff's favor, finding Defendants Collins and Williams

19   were deliberately indifferent to a serious risk of harm to Plaintiff. *Soremekun v. Thrifty Payless,*

20   *Inc.*, 509 F.3d at 984. Summary judgment is therefore inappropriate and should be denied.

21        **D.  Defendant Peterson: HDSP/Deliberate Indifference**

22        Defendants contend that, even when viewed in the light most favorable to Plaintiff,

23   Plaintiff's allegations against Defendant Peterson do not show that transferring Plaintiff from

24   SATF to HDSP created a substantial risk of serious harm. There is no evidence any SATF

25   inmates transferred with Plaintiff to HDSP were aware that Plaintiff had reported being assaulted

26   at SATF and no evidence those inmates intended to harm Plaintiff. Defendant Peterson reviewed

27   Plaintiff's central file and interviewed Plaintiff. Plaintiff did not identify the inmates or

28   correctional officers involved, nor indicate any dates of the assaults alleged. Plaintiff also rejected

25

placement in a sensitive needs yard (SNY). Defendants conclude that Peterson did not act with deliberate indifference as Plaintiff did not face an intolerably high risk of serious injury. (Doc. 75-2 at 22-23.)

Plaintiff responds that the "AdSeg committee deemed the safety concerns localized to SATF, not because of the buildings there, or the ground, or air, but because of inmates who were aware of the situation." Therefore, Plaintiff faced danger from those inmates who were transferred from SATF with Plaintiff to another facility and Defendant Peterson was aware of that danger. (Doc. 81 at 19.)

In support of the motion for summary judgment, Defendant Peterson declared he is a Correctional Counselor II Supervisor at SATF and was in that position when the events at issue arose. (Doc. 75-6 at 1, ¶ 1.) In response to a letter from Plaintiff directed to the Warden at SATF, Peterson reviewed Plaintiff's central file and interviewed Plaintiff on November 5, 2015. (*Id*. at 1-2, ¶ 2-3.) Plaintiff's central file indicated "Plaintiff had previously refused several offers to place him on Sensitive Needs Yard (SNY) to address his safety concerns." (*Id.* at 2, ¶ 3.) When Peterson interviewed Plaintiff and asked Plaintiff to clarify his safety concerns and his request, Plaintiff simply indicated that "CDCR was putting" or "placing" "him in jeopardy by transferring Plaintiff to another general population facility." (*Id*. at 2, ¶ 4.) Plaintiff advised Peterson that he would "never go to SNY.'" (*Id*.) At the conclusion of the interview, Peterson advised Plaintiff, based upon "the available information and Plaintiff's case factors, [that] the recommendation to transfer Plaintiff to an alternative facility for housing was appropriate." (*Id*.) Peterson declares Plaintiff did not advise him of "any information about his allegations against Defendants Williams and Collins," did not identify the inmates who assaulted him in the past and did not identify the correctional officers responsible for placing the assaultive inmates into Plaintiff's cell. (*Id*. at 2, ¶ 5.)

During his deposition, Plaintiff testified he recalled "explaining to [Peterson] the situation regarding [his] cellmates. I remember speaking to him about what took place at committee. I remember him - - I remember informing him that I had communicated my concerns and problems with all of the committee members in Ad Seg including the warden." (Castaneda Dep., at 83-84.)

Plaintiff recalled "reiterating what the committee members told" him to Peterson, including that if Plaintiff reported the assaults he would be punished, and that "[Peterson] and the other committee members were aware that [he] was going to punished and that [he] should expect it." (*Id*. at 84.) Peterson told Plaintiff "there was a price to pay for having reported the assaults." (*Id*. at 85.) During his deposition, Plaintiff also testified he was transferred to HDSP and was "placed on a yard with multiple inmates that were with [him] in Ad Seg at SATF, who were aware that [he] had reported assaults there at SATF." (Castaneda Dep., at 95.) Plaintiff could not identify those inmates, remember their names or provide any physical descriptions, stating he "had no idea who they are." (*Id*.) When asked how he knew those inmates were aware of his reporting the assaults at SATF, Plaintiff testified: "Because they - - I mean, you could hear conversations in Ad Seg, and everybody there in Ad Seg was being transferred to another institution who was being transferred to the same institution that I was going to." (*Id* at 95-96.) Plaintiff estimates there were about 30 inmates in his "general area" who transferred from SATF to HDSP; Plaintiff "could hear their conversations." (*Id*. at 96.)

In Plaintiff's declaration in support of his opposition to the motion for summary judgment, Plaintiff states that "[o]nce [he] arrived, at KVSP, [he] was interviewed by Counselor Peterson who informed [him] that he was aware that [Plaintiff] had escaped [his] punishment at HDSP." (Doc. 81 at 35, ¶ 7.)

The Eighth Amendment requires more than a "mere threat" of possible harm. *See Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986) ("The standard does not require that the guard or official believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before that officer is obligated to take steps to prevent such an assault. But, on the other hand, he must have more than a mere suspicion that an attack will occur"). While a prisoner's failure to give prison officials advance notice of a specific threat is not dispositive with respect to whether prison officials acted with deliberate indifference to the prisoner's safety needs, deliberate indifference will not be found where there is no other evidence in the record showing that the defendants knew of facts supporting an inference and drew the inference of substantial risk to the prisoner. *Labatad v. Corrs. Corp. of America*, 714 F.3d 1155, 1160-61 (9th Cir. 2013).

The Court acknowledges that "[d]eliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). "If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk.'" *Id*. (internal quotation marks & citation omitted).

Here, a material dispute exists as to whether Defendant Peterson was aware that Plaintiff faced a serious risk of harm when viewed favorably to Plaintiff. Defendant Peterson's declaration contradicts Plaintiff's deposition testimony and Plaintiff's declaration filed in support of his opposition to summary judgment. Given this factual dispute, a factfinder could find that Defendant Peterson had been made aware of Plaintiff's safety concerns in the form of assaults by his cellmates, that Peterson was aware of the threats of future assaults made to Plaintiff by Defendants Collins and Williams should Plaintiff report the cellmate assaults, and that by transferring Plaintiff to another facility where other inmates were aware Plaintiff had violated "prison rules" by reporting to SATF officials that he'd been assaulted by his cellmates, Plaintiff would continue to suffer assaults by other inmates. Taken together, these facts could lead a reasonable jury to conclude Defendant Peterson was on notice of a risk to Plaintiff and failed to adequately protect Plaintiff. As a result, summary judgment should be denied.

**E.  Defendants Acebedo & Pfeiffer: KVSP/Deliberate Indifference**

Defendants contends there is no evidence Defendants Acebedo and Pfeiffer acted with deliberate indifference to a serious risk of harm to Plaintiff. (Doc. 75-2 at 23-27.)

**1.  No Objectively Serious Risk of Harm at KVSP**

Defendants contend Plaintiff did not face a substantial risk of being harmed by other inmates at KVSP because there is no evidence any of the inmates at KVSP were aware of Plaintiff's report of assaults and Plaintiff's fear was speculative. Defendants also contend there is no evidence to show Plaintiff's cellmate at KVSP threatened him for reporting assaults at SATF. (Doc. 75-2 at 23-24.)

The Eighth Amendment of the United States Constitution protects prisoners against a prison official's "deliberate indifference" to "a substantial risk of serious harm." *Farmer*, 511 U.S. at 828. "Deliberate indifference" has both an objective and subjective component: there must

28

1   be an objective risk to inmate safety, and the official in question must also "draw the inference"

2   that the risk exists and disregard it. *Id.* at 837. For a risk to be objectively "substantial" it must be

3   more than merely possible, since prisons are, "by definition," institutions "of involuntary

4   confinement of persons who have a demonstrated proclivity for anti-social criminal, and often

5   violent, conduct." *Hudson v. Palmer*, 468 U.S. 517, 526 (1984); *see also Brown v. Hughes*, 894

6   F.2d 1533, 1537 (11th Cir. 1990) (noting that the "known risk of injury must be a strong

7   likelihood, rather than a mere possibility before a guard's failure to act can constitute deliberate

8   indifference" (internal quotation marks omitted)). For this reason, "speculative and generalized

9   fears of harm at the hands of other prisoners do not rise to a sufficiently substantial risk of serious

10  harm." *Williams v. Wood*, 223 F. App'x 670, 671 (9th Cir. 2007).

11         Defendants cite to Plaintiff's deposition at pages 101, 105 through 107, and 140, as well

12  as Defendants' Statement of Undisputed Fact (SUDF) number 39, in support of their assertions.

13  Defendants' SUDF number 39 provides: "Plaintiff was never physically or sexually assaulted

14  while he was housed at KVSP Facility A. (Castaneda Dep. 110:14-19, 135:11-15, 137:18-22.)"

15  Plaintiff disputes this fact, citing to paragraph 8 of his Declaration in his opposition which reads

16  as follows:

17              Following the January 21, 2016 UCC headed by Pfeiffer, I was asked
                to submit to restraints so that a medical doctor could have my weight
18              taken. As soon as the restraints were applied, I was escorted back to
                A-yard and placed into a cell with another inmate, before the
19              restraints were removed. I was denied food, water, sleep and mental
                health treatment by my cellmate.
20

21  (Doc. 81 at 35-36, ¶ 8.)[7]

22         In his deposition, as noted by Defendants, Plaintiff testified he had no evidence or reason

23

24  ───────────────────

    [7] A review of Plaintiff's first amended complaint and opposition to the motion for summary judgment
    provides a timeline. Plaintiff transferred from HDSP to KVSP on or about January 6, 2016. (Doc. 81 at 27;
25  *see also* Doc. 75-5 at 2, ¶ 3 [Acebedo Decl.].) A few days after arrival at KVSP, possibly on January 10,
    2016, Plaintiff met with Acebedo for the first time. (Doc. 13 at 9; Doc. 81 at 6.) Plaintiff informed
26  Acebedo "about what had occurred at PVSP, SATF, and HDSP," that "staff had been punishing [him] and
    were now trying to have [him] seriously hurt or killed." (Doc. 81 at 6; *see also* Doc. 13 at 9 [informed
27  "Acebedo about all of the aforementioned events (SATF, HDSP)"].)  On January 14, 2016, Plaintiff
    appeared before a committee headed by Defendant Acebedo. (Doc. 13 at 10; Doc. 81 at 6.) On January 21,
28  2016, Plaintiff appeared before a committee headed by Defendant Pfeiffer in Ad Seg. (Doc. 13 at 10; Doc.
    81 at 6.)

to believe that any other inmates from SATF had transferred with him to KVSP from SATF, and had no evidence or reason to believe that any of the inmates at KVSP were aware of the reports he made at SATF. (Castaneda Dep., at 101:16-25.) Citing to pages 105 through 107, Defendants contend that although Plaintiff's KVSP cellmate had a cellphone and Plaintiff was afraid KVSP inmates could learn about his reporting assaults by other inmates while at SATF, Plaintiff did not have any evidence that any KVSP inmates ever learned what had occurred at SATF through their cellphones. A review of the transcript reveals Plaintiff was asked whether he had "any evidence that this process [a background check performed via cell phone by inmates at one institution concerning inmates transferred in from another institution] occurred at Kern Valley State Prison?" (Castaneda Dep., at 106:23-24.) Plaintiff answered, "I don't have any knowledge that it actually happened, but I know that my cellmate was in possession of a cell phone." (*Id.* at 106:25-107:2.) Citing to page 140, lines 14 through 16 of Plaintiff's deposition, Defendants note that although Plaintiff alleged his KVSP cellmate prevented him from leaving the cell, Plaintiff admitted his cellmate never explained to Plaintiff why he was being punished, and simply stated that Plaintiff knew why. Plaintiff believed the reference was to his reporting assaults occurring at SATF. A review of the deposition transcript reveals that Plaintiff testified that he made his cellmate aware Plaintiff knew he was "going to punished" and that he was going to "wait for it to take place." (*Id.*, at 139:24-140:2.) When asked what his cellmate specifically said to him, Plaintiff testified:

> That I knew that I had punishment coming and that I shouldn't try to run from it. If I did, if I tried to say anything to the corrections officers that were passing by during count or distributing food, that he was going to administer punishment right then and there, and that I should just wait, essentially take the punishment, and that I would be okay afterwards, and that I would be allowed to remain in general population and everything would be okay.

(*Id.* at 140:5-13.) When Plaintiff was asked why he believed his cellmate was trying to punish him, Plaintiff testified: "Because I had removed myself from the yard once already there on A yard because I had reported in-cell assaults at SATF because I had myself removed from the general population in High Desert." (*Id.* at 140:18-21.)

Defendant Acebedo's declaration in support of Defendants' motion for summary

judgment states that Acebedo: (1) did not receive or review any information indicating Plaintiff

faced a serious risk of harm from any KVSP inmate; (2) does not recall speaking with Plaintiff on

January 10, 2016, or recall ever indicating to Plaintiff "that there were 'heavy hitters' or Mexican

Mafia gang members in KVSP Facility A; and (3) never indicated to Plaintiff punishments by

inmates for violating inmate rules were more severe in Facility A. (Doc. 75-5 at 2, ¶¶ 4-5.)

Regarding the January 14, 2016, UCC hearing, Acebedo states: (1) Plaintiff said he could

no longer program in general population due to a PREA complaint filed while housed at SATF;

(2) following review of Plaintiff's central file, Acebedo advised Plaintiff he was cleared to house

at Facility A because two separate investigations cleared Plaintiff's PREA complaints as

unsubstantiated; (3) Plaintiff continued to claim he could not program in general population and

refused to answer related questions; (4) when asked whether he wished to be housed in the SNY,

Plaintiff stated he did not wish to be placed in SNY; (5) when asked whether he had any specific

enemy concerns at KVSP, Plaintiff stated he did not; (6) based on the information received at the

hearing, Plaintiff was temporarily placed in Ad Seg due to his safety concerns; (7) Acebedo

drafted a confidential memorandum recommending Plaintiff's release to Facility A due to a lack

of new information regarding Plaintiff's safety or enemy concerns; (8) Acebedo did not state or

indicate he had spoken with Defendant Williams; (9) Acebedo did not state or otherwise indicate

Williams asked him to ensure Plaintiff's punishment was carried out at KVSP; and (10) Acebedo

did not state or otherwise indicate Plaintiff would be punished in any way while housed at

Facility A. (Doc. 75-5 at 2-3, ¶ 6.)

In light of the foregoing, the Court does not agree with Defendants that Plaintiff's fears

were speculative and generalized and, therefore, insufficient to show a serious risk of harm. The

evidence before the Court on summary judgment reflects a genuine dispute of material fact as to

whether Defendants Acebedo and Pfeiffer were aware of a substantial risk of serious harm to

Plaintiff from his cellmate or potential cellmates while housed at KVSP. *See, e.g.*, *Mitchell v.*

*Chavez*, No. 1:13-cv-01324-DAD-EPG, 2016 WL 3906956, at *4 (E.D. Cal. July 19, 2016)

(denying summary judgment where a plaintiff alleged that he had told guards about prior

altercations with members of the 2–5 gang). As a result, summary judgment should be denied.

1          **2.   Acebedo: Deliberate Indifference to Serious Risk of Harm at KVSP**

2          Defendants contend that even assuming Plaintiff's allegations regarding Defendant

3   Acebedo's statements were true, "there is still no evidence Counselor Acebedo knew of a serious

4   risk that Plaintiff would be harmed by inmates" at KVSP. Defendants contend Plaintiff admitted

5   he described the events at SATF in very general terms and "only expressed a fear that inmates at

6   [KVSP] would become aware of what occurred at SATF after being released to Facility A." (Doc.

7   75-2 at 24.) Defendants note Plaintiff did not identify the inmates who had assaulted him or any

8   specific staff members other than Williams or explain to Acebedo that the cellmates who

9   assaulted him were Southern Hispanic gang members. (*Id*.) Defendants contend Plaintiff admitted

10  "he did not have any evidence to believe that any [KVSP] inmates were aware of the reports he

11  made at SATF." (*Id*.) Nor did Plaintiff communicate any concerns after the January 14, 2016,

12  committee hearing. (*Id*.) Thus, "there is no evidence [Defendant] Acebedo was aware of facts

13  from which he could draw the inference that there was a serious risk Plaintiff would be harmed by

14  any [KVSP] inmates. Plaintiff's disclosure of past assaults at SATF is not sufficient to show he

15  faced an immediate risk of harm by any particular inmate" at KVSP and Plaintiff's failure to

16  identify the parties involved deprived Defendant Acebedo "of information that might have

17  allowed him to draw the inference that Plaintiff faced a risk of harm" at KVSP. (*Id*. at 24-25.)

18  Defendants also contend there is no evidence Acebedo "aware of Plaintiff's cellmate assignment

19  or that [Defendant] Acebedo had the opportunity to stop Plaintiff from being housed with his

20  [KVSP] cellmate." (*Id*. at 25.) Defendants conclude Defendant Acebedo did not act with

21  deliberate indifference when he recommended Plaintiff's transfer to Facility A or A yard, thereby

22  entitling him to summary judgment. (*Id*.)

23          In his opposition, Plaintiff contends Acebedo informed Plaintiff "that inmates who

24  violated rules on A-yard were severely punished because of the presence of Mexican Mafia

25  members," and that Williams had advised Acebedo "to not allow plaintiff to escape his

26  punishment." (Doc. 81 at 19.) Plaintiff contends that regardless of whether any KVSP inmate

27  were aware of what occurred at SATF, "Acebedo carried out Williams request and ensured that

28  plaintiff was hurt or killed." (*Id*.) Plaintiff contends Acebedo's actions "made sure that plaintiff

feared returning to the yard and was willing to go to Ad Seg," and that once in Ad Seg, Plaintiff's life would be "in danger on A-yard." (*Id*. at 20.) Plaintiff contends Defendant Acebedo "did not leave it up to chance whether KVSP inmate were aware of what had occurred at SATF" but acted "knowingly and willingly to put plaintiff's life at risk." (*Id*.)

The Court considers whether Acebedo was "both [] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and whether he drew that inference. *Farmer*, 511 U.S. at 837.

At his deposition, Plaintiff testified that at the first meeting with Defendant Acebedo, Plaintiff "explained to him that I reported in-cell assaults, and the correctional staff there told me that they were going to punish me for it. And that I believe that the punishment was going to be carried out there in his institution." (Castaneda Dep., at 99:5:9.) Acebedo advised Plaintiff there were "a lot of heavy hitters there on the yard, which meant that they were high ranking members of the Mexican mafia, which is the top of the hierarchy in Southern Hispanics. And that punishment that was administered against other inmates for violating rules was done very severely because of their presence there." (*Id*. at 99:23-100:5.) Plaintiff testified he told Acebedo that he "was concerned about what was going to happen to [him] there in his yard." (*Id.* at 100:11-12.) When asked whether Plaintiff identified "specific cellmates who had assaulted" him, Plaintiff replied, "[n]o, I spoke in very general terms about what had taken place at SATF." (*Id*. at 100:16-17.) Plaintiff testified he identified staff members in his discussion with Acebedo: "The only one that I actually remember specifically, I may have mentioned a lot of staff members, but I remember specifically just very quickly mentioning the name Williams, CC2 Williams, and only reason I remember that is because he stopped me in the conversation there and told me that he knew CC2 Williams and that they were actually very good friends." (*Id.* at 100:23-101:4.) Plaintiff further testified he did not explain to Acebedo that the cellmates who assaulted him were Southern Hispanics. (*Id*. at 101:11-15; but see 120:13-20 [Plaintiff and Acebedo "spoke about … the rules regarding Southern Hispanics and the punishment administered by Southern Hispanics for violation of those rules"].) At the subsequent committee hearing headed by Defendant Acebedo, Plaintiff told the committee "what [he] had already told Acebedo." (*Id*. at 103.) When

asked what Plaintiff told the committee about why he wanted a SNY placement, Plaintiff stated:

> I explained to them that I had reported assaults at SATF, and that they had told me that they were going to put me back in general population where inmates were aware that I had reported them, and they were going to allow the inmates to punish me, and that I was going - - that they were going to allow that to happen there on their yard, and that Acevedo told me that the punishment that's administered there is very severe.
>
> I explained to them my disability. That I would likely be killed, I told them that I didn't want to even given that an opportunity to take place. If they could place me in protective custody until I could be transferred to a sensitive needs yard.

(Castaneda Dep., at 104:20-105:7.) When asked whether he remembered telling Acebedo or any other committee members "exactly why" he was afraid he would be assaulted in housed at KVSP, Plaintiff testified he "had already explained the situation to Acebedo. And if I explained it to the committee members, it was only in general terms." (*Id*. at 108:10-12.)

Defendants rely in part upon their statement of undisputed facts numbers 35 and 37:

> 35. Plaintiff never told Counselor Acebedo the identities of the specific cellmates who had assaulted him, the identities of specific inmates he believed were threatening him, the fact that his SATF cellmates were Southern Hispanic gang members, or the identities of the officers who allegedly placed assaultive inmates in his cell. (Acebedo Dec. ¶¶ 4, 6, 8; Castaneda Dep. 100:13-25, 101:1-15, 120:13-24.)
>
> 37. After the January 14, 2016 hearing, Counselor Acebedo did not take any actions to affect Plaintiff's housing assignment or cellmate assignment besides drafting a confidential memorandum recommending Plaintiff be released back to Facility A. (Acebedo Dec. ¶¶ 6, 8.)

Plaintiff disputes both, citing to the Bonty and Ramirez declarations in support of his opposition to Defendants' summary judgment motion. Regarding number 35, neither the Bonty or Ramirez declarations specifically speak to or dispute the substance of the facts stated—what Plaintiff may or may not have told Acebedo, although both are potentially relevant to the reason Plaintiff did not report the inmate assaults. While Plaintiff testified he did not identify specific cellmates who assaulted him at SATF (Castaneda Dep., at 100:13-17), Plaintiff also testified that he explained to Acebedo that he "reported in-cell assaults, and that the correctional staff there told Plaintiff he was going to be punished for it, and that it was Plaintiff's belief that the "punishment was going

34

1    to be carried out there in [Acebedo's] institution." (Castaneda Depo., at 99:5-9.) According to

2    Plaintiff, Acebedo stated to him that "a lot of heavy hitters" were present on A-yard, "very high

3    ranking members of the Mexican Mafia, which is the top of the hierarchy in Southern Hispanics."

4    (*Id*. at 99:23-100:2.) Plaintiff also testified he told the committee headed by Acebedo that he

5    "wanted to be placed into protective custody until [he] was placed in the sensitive needs yard."

6    (*Id*. at 129:14-18.) Plaintiff asked for such placement because he "reported assaults by inmates to

7    staff, and that staff threatened to have [him] punished by inmates, and that [Plaintiff] believed that

8    the punishment was going to be carried out there" at KVSP. (*Id*. at 130:3-8.)

9        Regarding number 37, while the Bonty and Ramirez declarations do not explain whether

10   Acebedo took any actions affecting Plaintiff's housing, Plaintiff's deposition testimony in this

11   regard creates a genuine issue of material fact. Plaintiff testified that Acebedo visited him while

12   he was at CTC, after the January 2016 UCC hearing, and that Acebedo made statements relating

13   to Plaintiff's housing on that occasion. (Castaneda Dep., at 110:23-111:4, 112:12-113:6, 117:13-

14   16, 118:23-120:5, 135:3-9.)

15       The Court concludes there exist genuine issues of material fact concerning whether

16   Acebedo was "aware of facts from which the inference could be drawn that a substantial risk of

17   serious harm" to Plaintiff existed. *Farmer*, 511 U.S. at 837. Credibility is plainly at issue here and

18   is not a determination to be made on summary judgment. *Manley v. Rowley*, 847 F.3d at 711.

19           **3. Acebedo: No Admissible Evidence re 2/24/2016 Transfer**

20       Defendants contend there is no admissible evidence to support Plaintiff's claim that

21   Defendant Acebedo attempted to transfer Plaintiff to Facility A or A-yard. (Doc. 75-2 at 25-26.)

22   Defendants contend the only evidence of an attempted transfer is "the inadmissible hearsay

23   statements of the unidentified correctional officers who attempted to escort Plaintiff that day."

24   (*Id*. at 26.) Defendants also note that Plaintiff testified his last encounter with Acebedo was on

25   February 10, 2016, and that no other evidence exists to show Defendant Acebedo was personally

26   involved with Plaintiff's February 24, 2016 transfer. (*Id*.)

27       In his opposition, Plaintiff points to his deposition testimony that Defendant Acebedo

28   visited him while Plaintiff was "in CTC" and that Acebedo "informed plaintiff that he was going

                                              35

to be returned to A-yard." (Doc. 81 at 20.) Plaintiff contends he was returned to A-yard on February 24, 2016, and that "the officers informed plaintiff that they were carrying out orders of Acebedo." (*Id.*) Plaintiff further contends Defendant Acebedo is "the only Counselor II of A-yard," is "instrumental in any transfer of inmates in and out of A-yard," that Acebedo "wrote a memo that asked for plaintiff to be returned back to A-yard" and staff would defer to Defendant Acebedo regarding housing. (*Id.*)

In support of the motion for summary judgment, Defendant Acebedo declared as follows:

> After the January 14, 2016 UCC hearing, I did not have any further interactions with Plaintiff. Other than drafting the confidential memorandum described in Paragraph 6, I did not take any other actions to affect Plaintiff's housing assignment or cellmate assignment at KVSP. I never reviewed or received any information indicating Plaintiff's cellmates in Facility A would threaten or had threatened to harm him in January 2016. I never told Plaintiff in February 2016 I was going to ensure he returned to Facility A. I never told Plaintiff that I would allow him to retain a bottle of lotion to use the next time he was sexually assaulted. I also never directed any other correctional staff members to pack up Plaintiff's personal property and to return Plaintiff to Facility A.

(Doc. 75-5 at 3, ¶ 8.) As noted in section E.2, *supra,* Plaintiff testified at his deposition that Acebedo visited him while he was at CTC after the January 2016 UCC hearing, and that Acebedo made statements relating to Plaintiff's housing on that occasion. (*See* Castaneda Dep., at 110:23-111:4, 112:12-113:6, 117:13-16, 118:23-120:5, 135:3-9.) Thus, there is some evidence other than inadmissible hearsay concerning Plaintiff's claims that Acebedo was behind Plaintiff's return to A Yard.

The Court again concludes there exist genuine issues of material fact concerning whether Acebedo was "aware of facts from which the inference could be drawn that a substantial risk of serious harm" to Plaintiff existed, and that Acebedo drew that inference. *Farmer*, 511 U.S. at 837. Credibility is not a determination to be made on summary judgment. *Manley v. Rowley*, 847 F.3d at 711. Therefore, summary judgment should be denied.

### 4. Pfeiffer: Deliberate Indifference to Serious Risk of Harm at KVSP

Defendants next contend that even if Plaintiff faced an objectively serious risk of harm, there is no evidence Defendant Pfeiffer was deliberately indifferent to that risk. (Doc. 75-2 at 26-

27.) Defendants cite Plaintiff's deposition testimony that Pfeiffer "only said he had read a confidential report explaining why Plaintiff had been placed in the ASU and that he agreed with the report's recommendations to return Plaintiff to A-Yard." (*Id*. at 26.) Defendants note Plaintiff admitted Pfeiffer did not identify the author of the report he had reviewed, nor discussed the contents of the report other than to note his agreement with it, and that Plaintiff had never read the report. (*Id*.)  Defendants also note Plaintiff did not tell Defendant Pfeiffer about any specific inmates who were threatening him or about any of the attacks he had previously experienced." (*Id*. at 27.) Further, Pfeiffer declared he "never received or reviewed any information indicating Plaintiff had any safety concerns or experienced any safety issued with his cellmates." (*Id*.) Therefore, Defendants contend Defendant Pfeiffer is entitled to summary judgment as there is no evidence Pfeiffer knew of any facts supporting an inference or that Pfeiffer drew an inference that Plaintiff faced a substantial risk of harm. (*Id*.)

In his opposition, Plaintiff contends Defendant Pfeiffer "knew that if plaintiff was removed from A-yard for safety concerns, that plaintiff could no longer return to A-yard." (Doc. 81 at 21.) Plaintiff contends "the only memorandum written was by Acebedo," and that Pfeiffer "knew Acebedo wanted plaintiff to be hurt or killed." (*Id*.) Plaintiff contends that when "Pfeiffer came across the reference to Attempted Murder of a Corrections Officer" during the hearing, Pfeiffer agreed "with Acebedo to have plaintiff hurt or killed." (*Id.*) Plaintiff further contends Pfeiffer was "aware of basic inmate rules" and those rules were "strictly enforced on F.P. level IV yards, with lethal force." (*Id*.) Plaintiff contends those inmate rules were used by Pfeiffer and Acebedo "to carry out punishment on inmates under the guise of ignorance." (*Id*.)

In support of the motion for summary judgment, Defendant Pfeiffer declares (1) that during the January 21, 2016 classification committee hearing he never received or reviewed any information indicating Plaintiff faced a serious risk of harm if he were housed with other inmates at KVSP; (2) he never spoke with Defendants Williams, Collins, Peterson or Acebedo about Plaintiff's safety issues or housing prior to the hearing; (3) he was never told or otherwise indicated to Plaintiff that his decision was based entirely on Plaintiff's disciplinary record of attempted murder of a correctional officer, and did not base his decision entirely on that history;

(4) he does not recall having any direct interactions with Plaintiff following the hearing; and (5) he never received or reviewed any information indicating Plaintiff's cellmate in Facility A would threaten or had threatened to harm Plaintiff in January 2016. (Doc. 75-8 at 1-2, ¶¶ 3-5.)

Plaintiff testified at his deposition that Pfeiffer "was aware that [Plaintiff] would be hurt if [he] was returned to A yard, and he actually made that decision to have me returned to A yard." (Castaneda Dep., at 124:17-21.) Regarding the evidence to support his theory, Plaintiff testified Pfeiffer "was present there at the committee and this is - - this was the discussion that took place during committee." (*Id*. at 124:22-125:1.) Regarding his discussion with Pfeiffer, Plaintiff stated: "He actually read the report of Acevedo explaining why I was placed in Ad Seg, and also read the recommendation of Acebedo that I be returned back to A yard, and agreed with the recommendation that I be returned back to [A] yard after I explained to him that I was going to be hurt or killed if I was returned back to the same population I just had myself removed from." (*Id*. at 125:4-10.) Asked specifically about the "report" read by Pfeiffer, Plaintiff testified Pfeiffer explained to him during the committee that "he had read the report." (*Id*. at 125:15-18.) The report was not identified by Pfeiffer as authored by Acebedo, but Plaintiff testified Pfeiffer "said he read the confidential report explaining the reason why" Plaintiff had been placed in Ad Seg, which Plaintiff testified "was the report written by" Acebedo. (*Id*. at 125:21-23.) Pfeiffer "referred to it as the confidential memorandum that explained why" Plaintiff was in Ad Seg. (*Id*. at 126:1-2.) Because Plaintiff acknowledged he had not read the report himself, he was asked what led him to believe Acebedo was the author of the report Pfeiffer read at the hearing; Plaintiff testified that Acebedo told Plaintiff "during the first committee that he was going to write the report saying that [Plaintiff] be placed in Ad Seg with the recommendation that [Plaintiff be returned right back to A yard." (*Id*. at 125:6-126:14.) Plaintiff further testified he told the committee headed by Pfeiffer that he asked to be kept in Ad Seg until he could be transitioned into a sensitive needs yard. (*Id*. at 130:15-17.)

Here, Plaintiff's deposition testimony presents some evidence that Defendant Pfeiffer was deliberately indifferent to the serious harm Plaintiff faced. It is for a jury to decide whether or not Pfeiffer was deliberately indifferent to a serious risk of harm to Plaintiff at KVSP. *Manley v.*

1    *Rowley*, 847 F.3d at 711.

2    **VII.    Qualified Immunity**

3           Defendants also contend they are entitled to qualified immunity. (Doc. 75-2 at 27-30;

4    Doc. 89 at 23-24.)

5           Government officials enjoy qualified immunity from civil damages unless their conduct

6    violates clearly established statutory or constitutional rights. *Jeffers v. Gomez*, 267 F.3d 895, 910

7    (9th Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A qualified immunity

8    analysis requires determining: (1) whether facts alleged, taken in the light most favorable to the

9    injured party, show the defendants' conduct violated a constitutional right; and (2) whether the

10   right was clearly established. *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 915 (9th Cir. 2012) (en

11   banc) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Courts may "exercise their sound

12   discretion in deciding which of the two prongs of the qualified immunity analysis should be

13   addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*,

14   555 U.S. 223, 236 (2009).

15          "[S]ummary judgment based on qualified immunity is improper if, under the plaintiff's

16   version of the facts, and in light of the clearly established law, a reasonable officer could not have

17   believed his conduct was lawful." *Schwenk v. Hartford*, 204 F.3d 1187, 1196 (9th Cir. 2000)

18   (citing *Grossman v. City of Portland*, 33 F.3d 1200, 1208 (9th Cir. 1994)). The Supreme Court

19   has "repeatedly told courts ... not to define clearly established law at a high level of generality."

20   *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (alteration in original) (quoting *Ashcroft*, 563 U.S. at

21   742). "The dispositive question is 'whether the violative nature of particular conduct is clearly

22   established.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 563 U.S. 731, 742 (2011)). "[T]his

23   inquiry 'must be undertaken in light of the specific context of the case, not as a broad general

24   proposition.'" *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier*, 533 U.S. at 201).

25          "Qualified immunity gives government officials breathing room to make reasonable but

26   mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. at 743. The

27   existence of triable issues of fact as to whether prison officials were deliberately indifferent does

28   not necessarily preclude qualified immunity. *Estate of Ford v. Ramirez–Palmer*, 301 F.3d 1043,

1    1053 (9th Cir. 2002).

2            Defendants Collins and Williams contend they are entitled to qualified immunity because

3    the evidence indicates they were not deliberately indifferent to a serious risk that Plaintiff would

4    be harmed by his SATF cellmate and there is no medical evidence to show Plaintiff was sexually

5    assaulted. (Doc. 75-2 at 28.) Defendant Peterson contends he is entitled to qualified immunity

6    because he did not act with deliberate indifference in response to Plaintiff's letter as Plaintiff did

7    not provide Peterson with specific details about his safety concerns regarding the transfer from

8    SATF to HDSP. (*Id.*) Defendants Acebedo and Pfeiffer contend they did not act with deliberate

9    indifference at KVSP because Plaintiff never provided them with information about specific

10   safety concerns and never informed them that he was threatened by his KVSP cellmate. (*Id.*)

11           Defendants contend "case law does not clearly establish that deliberate indifference occurs

12   when the inmate never provides the officer with information about current threats to his safety

13   and only expresses a generalized fear of harm based on past assaults." (Doc. 89 at 24.)

14   Defendants' contention however is contingent upon a construction of the disputed facts in their

15   favor. If Plaintiff's version of facts is believed by the jury, Defendants acted with the specific

16   purpose of punishing Plaintiff and causing him harm. A reasonable officer would not have

17   believed that it was lawful to ignore Plaintiff's concerns regarding his safety posed by the inmates

18   housed in Plaintiff's cell at the various institutions.

19           The Court has already determined that under Plaintiff's version of events the allegations

20   demonstrate violations of Plaintiff's rights under the Eighth Amendment. The first prong—

21   whether facts alleged, taken in the light most favorable to the injured party, show the defendants'

22   conduct violated a constitutional right—is therefore resolved in Plaintiff's favor. The second

23   prong—whether the right was clearly established—relies on Defendants' version of facts that are

24   disputed by Plaintiff.

25           In sum, because Defendants have not met their burden of demonstrating the absence of a

26   genuine issue of material, summary judgment based on qualified immunity is inappropriate. *See*

27   *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Act Up!/Portland v. Bagley*, 988

28   F.2d 868, 873 (9th Cir. 1993) (if there is a genuine dispute as to the "facts and circumstances

within an officer's knowledge," or "what the officer and claimant did or failed to do," summary judgment is not appropriate.)

**VIII.    CONCLUSION AND RECOMMENDATIONS**

Based on the foregoing, the Court recommends that Defendants' motion for summary judgment (Doc. 75) be DENIED.

These Findings and Recommendations will be submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). **<u>Within 14 days</u>** of the date of service of these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned, "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may result in waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **September 8, 2022**                    */s/ Sheila K. Oberto*
                                        UNITED STATES MAGISTRATE JUDGE